# Exhibit 1

## APPENDIX D

## CERTIFICATE OF OWNERSHIP

The undersigned, who is the authorized representative of ▮▮▮▮▮▮▮ ("Franchisee"), hereby certifies to Pizza Hut, Inc., that the following information is true and correct and reflects all of the individuals who own (directly or indirectly) any interest in Franchisee:

| Name | Shareholder, Officer, Director, Member, Manager, and/or Partner | Percentage of Interest in Franchisee | Number of Class A voting shares in PH Hospitality Group, LLC | Number of Class B non-voting shares in PH Hospitality Group, LLC |
|---|---|---|---|---|
| | Manager/Sole Member | 100% | | |
| | President/Director/Member | — | 212.48 | 0 |
| | Director/Member | — | 287.47 | 0 |
| | Director/Member | — | 3.75 | 0 |
| | Member | — | 186.23 | 0 |
| | Member | — | 371.21 | 0 |
| | Member | — | 33.747 | 0 |
| | Member | — | 67.494 | 0 |
| | Member | — | 74.99 | 0 |
| | Member | — | 0 | 1049.82 |
| | | | 1237.37 | 1049.82 |

Dated as of the 25ᵗʰ day of July, 2005.

By: ▮▮▮▮▮▮▮▮▮

its Manager and Sole Member

By: ▮▮▮▮▮▮▮

# January 1, 2003
# PIZZA HUT, INC.
# LOCATION FRANCHISE AGREEMENT

App. 003



## Table of Contents

Page

1.  DEFINITIONS .................................................................................................... 1
    1.1   Adequate Delivery Service ...................................................................... 1
    1.2   Advertising Fund ...................................................................................... 1
    1.3   Affiliates .................................................................................................. 1
    1.4   Agreement ................................................................................................ 1
    1.5   Approved Products ................................................................................... 2
    1.6   CPR .......................................................................................................... 2
    1.7   Co-op ........................................................................................................ 2
    1.8   Delivery Area ........................................................................................... 2
    1.9   Development Opportunity ........................................................................ 2
    1.10  Direct or Indirect ..................................................................................... 2
    1.11  Franchisee ................................................................................................ 2
    1.12  Good Standing .......................................................................................... 2
    1.13  Gross Sales ............................................................................................... 2
    1.14  Initial Franchise Fee ................................................................................ 2
    1.15  Interest ..................................................................................................... 2
    1.16  IPHFHA .................................................................................................... 2
    1.17  Lease ........................................................................................................ 2
    1.18  Location(s) ............................................................................................... 3
    1.19  Manual ..................................................................................................... 3
    1.20  Monthly Service Fee ................................................................................ 3
    1.21  Person ...................................................................................................... 3
    1.22  PHI ........................................................................................................... 3
    1.23  Pizza Hut Marks ...................................................................................... 3
    1.24  Related Persons ........................................................................................ 3
    1.25  Single Site Region and Single Site Franchisee ....................................... 3
    1.26  System Restaurants ................................................................................... 3
    1.27  System Restaurant Concepts .................................................................... 3
    1.28  Technology Systems ................................................................................ 4
    1.29  Term ......................................................................................................... 4
    1.30  Transfer .................................................................................................... 4
    1.31  Appendix I Defined Terms ....................................................................... 4

2.  GRANT OF FRANCHISE ................................................................................ 4
    2.1   Grant of Franchise .................................................................................... 4
    2.2   No Subfranchise Right ............................................................................. 4
    2.3   Delivery Service ....................................................................................... 4
    2.4   Relocation Rights ..................................................................................... 5
    2.5   Limitations on the Franchise .................................................................... 5
    2.6   Protected Territories. ................................................................................ 5

Table of Contents
(continued)

Page

2.7    Right of First Refusal On New System Restaurants .......................................... 6
2.8    Renewal Rights ................................................................................................ 7
2.9.   Notice of Intent Not to Renew .......................................................................... 9

3.     DESIGNATION AND USE OF MARKS ......................................................... 10
3.1    Designation of Pizza Hut Marks ...................................................................... 10
3.2    Use of Pizza Hut Marks ................................................................................... 10
3.3    Ownership of Pizza Hut Marks ........................................................................ 10
3.4    Protection of Pizza Hut Marks ......................................................................... 10

4.     TRAINING AND ASSISTANCE ..................................................................... 11
4.1    Management Training Programs ....................................................................... 11

5.     MANUAL ......................................................................................................... 11
5.1    Loan of Manual ............................................................................................... 11
5.2    Ownership of Manual ...................................................................................... 11
5.3    Confidentiality of Manual ............................................................................... 12
5.4    Protection of Trade Secrets .............................................................................. 12
5.5    Updates ........................................................................................................... 12

6.     STANDARDS; DUTIES OF FRANCHISEE ................................................... 12
6.1    Interpretation of Standards .............................................................................. 12
6.2    Promulgation of Standards ............................................................................... 12
6.3    Limitation on Promulgation of Standards ........................................................ 12
6.4    Inspections ...................................................................................................... 12
6.5    Compliance with Laws .................................................................................... 13
6.6    Identification ................................................................................................... 13
6.7    Uniforms ......................................................................................................... 13
6.8    Coin-Operated Machines ................................................................................. 13
6.9    Assumed Name Certificate .............................................................................. 13
6.10   Approved Products .......................................................................................... 14
6.11   Standard and Optional Items ........................................................................... 14
6.12   Menu Modification .......................................................................................... 14
6.13   No Unprepared Products .................................................................................. 14
6.14   Point-of Sales System ..................................................................................... 14
6.15   Prices .............................................................................................................. 14

7.     ADVERTISING ................................................................................................ 14
7.1    National Advertising ........................................................................................ 14
7.2    Local Advertising ............................................................................................ 15
7.3    Approval of Advertising .................................................................................. 15
7.4    Cooperative Advertising .................................................................................. 16

Location Franchise Agreement

Table of Contents
(continued)

Page

7.5 Limitation on Aggregate Amount of Advertising Contributions .................... 16

8. PURCHASE OF EQUIPMENT, SUPPLIES AND OTHER PRODUCTS ................. 16
   8.1 Use of Approved Supplies and Approved Distributors ................................. 16
   8.2 Purchasing Co-op ...................................................................................... 16

9. FEES AND PAYMENT SCHEDULE ........................................................ 17
   9.1 Initial Franchise Fee ................................................................................. 17
   9.2 Monthly Service Fees ................................................................................ 17
   9.3 Transfer Fees ............................................................................................ 18
   9.4 Offset Rights ............................................................................................. 18
   9.5 Taxes ....................................................................................................... 18

10. BUSINESS PREMISES ......................................................................... 18
    10.1 Restrictions on Use .................................................................................. 18
    10.2 Site Selection .......................................................................................... 18
    10.3 Construction of System Restaurants ......................................................... 18
    10.4 Right to De-Identify ................................................................................. 18
    10.5 Repair and Maintenance .......................................................................... 19
    10.6 Proof of Compliance ................................................................................ 19
    10.7 System Restaurant Closure ...................................................................... 19

11. BOOKS AND RECORDS; REPORTS; AUDITS ....................................... 19
    11.1 Maintenance of Books and Records .......................................................... 19
    11.2 Reports .................................................................................................... 19
    11.3 Inspection and Audit ................................................................................ 20
    11.4 Selection of Accountants .......................................................................... 20

12. COVENANTS AGAINST COMPETITION ............................................... 20
    12.1 Acknowledgments .................................................................................... 20
    12.2 In-Term Covenants .................................................................................. 21
    12.3 Post-Term Covenants .............................................................................. 21
    12.4 Perpetual Covenant ................................................................................. 21
    12.5 Stock Ownership ...................................................................................... 22

13. EMPLOYMENT RELATIONS ................................................................ 22
    13.1 Franchisee's Employees ........................................................................... 22
    13.2 Interference ............................................................................................. 22

14. TRANSFERS ....................................................................................... 22
    14.1 Transfers by PHI ...................................................................................... 22
    14.2 Transfers by Franchisee ........................................................................... 22

-iii-

Table of Contents
(continued)

Page

| | | | |
|---|---|---|---|
| | 14.3 | Transfer of Assets | 22 |
| | 14.4 | Consent to Transfers | 23 |
| | 14.5 | Death or Incapacity | 23 |
| | 14.6 | Right of First Refusal | 24 |
| | 14.7 | Other Permitted Assignments | 24 |
| 15. | | NON-INDIVIDUAL FRANCHISEES | 24 |
| | 15.1 | List of Individual Owners | 24 |
| | 15.2 | Personal Guaranties | 24 |
| | 15.3 | Organizational Documents | 25 |
| | 15.4 | Transfer Restrictions | 25 |
| | 15.5 | Permitted Assignments | 25 |
| | 15.6 | No Publicly Traded Ownership Interests | 25 |
| | 15.7 | Changes in Ownership or Organization | 26 |
| 16. | | INSURANCE AND INDEMNIFICATION | 26 |
| | 16.1 | Property Insurance | 26 |
| | 16.2 | Liability Insurance | 26 |
| | 16.3 | Proof of Insurance | 26 |
| | 16.4 | Indemnification and Waiver | 26 |
| 17. | | REQUESTS FOR WAIVERS AND CONSENTS | 27 |
| | 17.1 | Requests for Waivers or Consents | 27 |
| | 17.2 | Effect of Waivers and Consents | 27 |
| | 17.3 | No Implied Waivers | 27 |
| 18. | | DEFAULT AND TERMINATION | 27 |
| | 18.1 | Defaults Without Cure Right | 27 |
| | 18.2 | Defaults Subject to Cure Rights | 28 |
| | 18.3 | Non-Termination Remedies | 29 |
| 19. | | POST-TERMINATION PROVISIONS | 29 |
| | 19.1 | Use of Pizza Hut Marks and Systems | 29 |
| | 19.2 | Cessation of Rights | 29 |
| | 19.3 | Effect on Other Duties | 29 |
| | 19.4 | Trademarked Items | 29 |
| | 19.5 | Telephone Numbers | 29 |
| 20. | | DISPUTE RESOLUTION | 30 |
| | 20.1 | Jurisdiction and Governing Law | 30 |
| | 20.2 | Remedies Cumulative | 30 |
| | 20.3 | Mediation | 30 |

-iv-

**Table of Contents**
(continued)

Page

|  | 20.4 | Injunctive Relief | 30 |
|  | 20.5 | Attorneys' Fees | 30 |
| 21. | | MISCELLANEOUS | 31 |
|  | 21.1 | Relation of Parties | 31 |
|  | 21.2 | Counterparts | 31 |
|  | 21.3 | Third-Party Beneficiaries | 31 |
|  | 21.4 | Severability | 31 |
|  | 21.5 | Protests, Requests and Notices | 31 |
|  | 21.6 | Time of Essence | 32 |
|  | 21.7 | Rules of Construction | 32 |
|  | 21.8 | Merger | 33 |

App. 008

# PIZZA HUT, INC.

# LOCATION FRANCHISE AGREEMENT

**DATE:**     **January 1, 2003**

**PARTIES:**     **"PHI" —**     Pizza Hut, Inc.
14841 Dallas Parkway
Dallas, Texas 75254-7552

**"Franchisee" —**



**RECITALS:** PHI franchises a system of restaurants throughout the United States and in certain foreign countries under the name and mark "PIZZA HUT". PHI and Franchisee have previously entered into a Franchise Agreement (the "Old Franchise Agreement") pursuant to which Franchisee was granted the right to operate one or more "PIZZA HUT" restaurants at the site(s) specified in this Agreement. PHI and Franchisee now desire that this Agreement supersede the Old Franchise Agreement.

**AGREEMENT:** NOW, THEREFORE, in consideration of the mutual promises and agreements set forth in this Agreement, PHI and Franchisee agree as follows:

## 1. DEFINITIONS

In this Agreement, the following terms have the following meanings:

1.1     Adequate Delivery Service. "Adequate Delivery Service" means delivery of Approved Products in accordance with the standards described in Section 2.3.

1.2     Advertising Fund. The "Advertising Fund" is the fund established in accordance with Section 7.1, into which PHI, Franchisee, and other domestic franchisees of PHI (subject to the terms of Section 7.1) make payments for national advertising, and which PHI or its designee will spend in accordance with Section 7.1.

1.3     Affiliates. A Person's "Affiliates" are all Persons that directly or indirectly control, are controlled by, or are under common control with, the Person.

1.4     Agreement. "Agreement" means this Franchise Agreement (including all Appendices), as amended from time to time.

**-1-**

**1.5** Approved Products. "Approved Products" are the food, beverages, promotional items, and other products approved by PHI (in the Manual or another written document) for sale in, or other disposition to the public from, System Restaurants.

**1.6** CPR. "CPR" refers to the Center for Public Resources, Inc., a non-profit organization which provides, among other things, mediation and arbitration services.

**1.7** Co-op. "Co-op" means any cooperative advertising association established in accordance with Section 7.4.

**1.8** Delivery Area. "Delivery Area" means the area(s) described in Appendix B, or the modified Delivery Area if Franchisee's Delivery Area is changed pursuant to Section 2.3.

**1.9** Development Opportunity. "Development Opportunity" has the meaning assigned to it in Section 2.7.

**1.10** Direct or Indirect. "Direct or indirect", when used in describing ownership or other interests in an entity or an agreement, means that intervening levels of ownership are disregarded.

**1.11** Franchisee. "Franchisee", when capitalized, means the Person(s) identified as "Franchisee" on the first page of this Agreement, or any approved successor.

**1.12** Good Standing. Franchisee is in "Good Standing" under this Agreement at all times except when Franchisee is in default of this Agreement (regardless of whether PHI has given Franchisee notice pursuant to Section 18.2).

**1.13** Gross Sales. "Gross Sales" means the total of all cash or other payments received (including the fair value of an exchange and all payments by check, credit, or charge account, regardless of whether the checks, credits, or charge accounts are ultimately paid) for the sale or use of any products, goods, or services that are sold at or from any System Restaurant. Gross Sales exclude only price discounts and allowances, and taxes imposed directly on sales, or services by governmental authorities, and then only if the amount of the tax is added to or absorbed in the selling price and is actually paid to the appropriate governmental authority.

**1.14** Initial Franchise Fee. "Initial Franchise Fee" refers to the payment Franchisee must make to PHI in order to obtain the right to operate System Restaurants, as described in Section 9.1.

**1.15** Interest. "Interest", when used in the context of an interest in Franchisee or in this Agreement, means any direct or indirect beneficial or legal ownership interest in Franchisee or in this Agreement.

**1.16** IPHFHA. "IPHFHA" means I.P.H.F.H.A., Inc., a Delaware corporation, that is frequently referred to as the International Pizza Hut Franchise Holders Association.

**1.17** Lease. "Lease" means any written or oral contract allowing one Person to possess or use the property of another Person, and includes subleases and contracts for deed.

1.18   Location(s). "Location(s)" means the specific site or sites, listed in Appendix B, at which franchisee is authorized by this Agreement to operate System Restaurants.

1.19   Manual. The "Manual" is the set of documents (in one or more volumes), as published, supplemented and revised (from time to time), and disseminated by PHI, that explain and define the proper operation of System Restaurants.

1.20   Monthly Service Fee. "Monthly Service Fee" refers to the payments required of Franchisee, as described in Section 9.2.

1.21   Person. "Person" means both natural persons and legal entities (including corporations, partnerships, limited liability companies, and trusts).

1.22   PHI. "PHI" means Pizza Hut, Inc., a California corporation, and its successors and assigns.

1.23   Pizza Hut Marks. "Pizza Hut Marks" means only those trademarks, trade names, service marks, trade dress (including product package designs), symbols, slogans, emblems, logos, insignia, designs, external and internal building designs and other architectural features, and any combination of the foregoing that Franchisee is authorized to use in connection with the System Restaurants. Appendix A to this Agreement is a list of the Pizza Hut Marks that consist of words or a combination of words and design that Franchisee is authorized to use on the date of this Agreement. PHI may, from time to time, designate other Pizza Hut Marks pursuant to Section 3.1 of this Agreement.

1.24   Related Persons. Franchisee's "Related Persons" consist of all Persons having an Interest in Franchisee; all of Franchisee's Affiliates; the officers, directors, partners, trustees, and beneficiaries of Franchisee and of any Person having an Interest in Franchisee; and the spouses and minor children of any of the foregoing individuals.

1.25   Single Site Region and Single Site Franchisee. "Single Site Region" and Single Site Franchisee" have the meanings assigned to such terms in Section 2.7.

1.26   System Restaurants. "System Restaurants" are only the following three types of Dine-in "Pizza Hut" restaurant concepts: (a) "Pizza Hut Restaurants" - (PHI's original concept) from which Pizza Hut pizza (and other Approved Products) are sold for dine in and carryout consumption, and may be delivered for off-premises consumption; in order to be a Pizza Hut Restaurant, a restaurant must have either at least 30 seats or at least 15% of its sales attributable to dine-in service; (b) "Delivery Restaurants" - from which Pizza Hut pizza (and other Approved Products) are delivered for off-premises consumption; and (c) "Delivery/Carryout" (or "DelCo") Restaurants - from which Pizza Hut pizza (and other Approved Products) are sold for carryout and are delivered, all for off-premises consumption.

1.27   System Restaurant Concepts. The phrase "System Restaurant Concepts" refers collectively to the three types of Systems Restaurants described in Section 1.26. "System Restaurants" and "System Restaurant Concepts" do not include any other "Pizza Hut" restaurant concept or any other type of restaurant or business owned by PHI or its Affiliates.

-3-

1.28    Technology Systems. "Technology Systems" refers to the hardware and software which Franchisee may install and use in connection with its System Restaurants, as described in Section 6.14.

1.29    Term. "Term" means the period during which the rights granted by this Agreement are in effect, which starts on January 1, 2003, and (unless terminated early as allowed by Section 18) ends on the day before the 30th anniversary of this Agreement, or any succeeding renewal term if this Agreement is renewed. The Term of this Agreement may be renewed in accordance with the provision of Section 2.8.

1.30    Transfer. "Transfer" includes every absolute or conditional method of transferring a legal or equitable, record or beneficial Interest in Franchisee or in this Agreement, whether voluntary, involuntary, or by operation of law, and includes a change in beneficiaries or trustees of a trust.

1.31    Appendix I Defined Terms. The terms "Adjusted Upgrade Schedule", "Anniversary Date", "Approved Investment", "Checkpoint Date", "Designated Arbitrator", "Duly Modified", "Excepted Restaurant", "Full Reimage", "High Volume Restaurant", "Initial Upgrade Schedule", "Initial Upgrade Schedule Notice", "Low Volume/High Population Restaurant", "Low Volume/Low Population Restaurant", "Middle Volume/High Population Restaurant", "Middle Volume/Low Population Restaurant", "Minimum Asset Standards", "Non-Standard Upgrade", "Partial Reimage", "Rebuild", "Refurbish", "Reimage", "Relocation", "Remodel", "Replacement Demand", "Reversionary Event", "Upgrade", "Upgrade Committee", "Upgrade Requirements" and "WRPA" have the meanings ascribed to them in Appendix I.

## 2. GRANT OF FRANCHISE

2.1    Grant of Franchise. PHI grants to Franchisee, during the Term, the non-exclusive franchise to operate System Restaurants at the Location(s),using the Pizza Hut Marks; to promote and sell Approved Products and related services from System Restaurants at the Location(s); and to deliver Approved Products produced at System Restaurants throughout the Delivery Area (subject to Franchisee providing Adequate Delivery Service as provided for in Section 2.3). Franchisee may not operate any System Restaurant except at the Location(s), and may not deliver products produced at the System Restaurants or using the Pizza Hut Marks except within the Delivery Area. Franchisee covenants that it will use its best efforts to promote sales of Approved Products from its System Restaurants and throughout the Delivery Area.

2.2    No Subfranchise Right. The franchise granted by this Agreement is personal to Franchisee. Franchisee may not subfranchise to any other Person all or any part of the franchise granted by this Agreement.

2.3    Delivery Service. Franchisee shall provide Adequate Delivery Service to the entire Delivery Area throughout the Term. The term "Adequate Delivery Service" means delivery service in accordance with PHI's then-current standards for delivery, taking into account criteria including potential sales volume, market demographics, saturation analysis, diversion of sales from Franchisee's other System Restaurants, and physical and geographic characteristics of the Delivery Area.

-4-

App. 012

At any time during the Term, PHI may consider whether Franchisee is providing Adequate Delivery Service to the entire Delivery Area. If PHI preliminarily determines that Franchisee is not providing Adequate Delivery Service throughout the Delivery Area, PHI will give Franchisee written notice of the areas within the Delivery Area that are not receiving Adequate Delivery Service. Franchisee may, within 90 days, submit a written protest to PHI that identifies the geographic boundaries of the area to which Franchisee contends it is providing Adequate Delivery Service. If Franchisee fails to timely submit a written protest, PHI's preliminary determination shall become immediately effective. PHI will consider any written protest timely submitted by Franchisee but PHI shall in its sole discretion make the final determination of the area to which Franchisee is providing Adequate Delivery Service. PHI will give Franchisee written notice of its final determination within 90 days after receipt of Franchisee's written protest, at which point it shall be effective. The Delivery Area shall be re-defined to include only the areas to which PHI finally determines Franchisee is providing Adequate Delivery Service.

2.4 Relocation Rights. If Franchisee desires to relocate any of Franchisee's existing System Restaurants, Franchisee will request PHI's permission to do so. As part of its request, Franchisee must supply PHI with justification for the relocation (such as expiration of an existing lease or changed demographics) and any other information PHI requests. If PHI consents to the relocation, PHI will notify Franchisee of the portion (if any) of the Initial Franchise Fee that Franchisee may transfer from the existing System Restaurant to the proposed replacement System Restaurant and the date by which Franchisee must open the replacement System Restaurant to receive the credit (if any). To receive any credit, Franchisee must open the replacement System Restaurant for business within 12 months after closure of the existing System Restaurant. This Agreement will govern Franchisee's operations at any such replacement System Restaurant.

2.5 Limitations on the Franchise. Franchisee (a) may not conduct any business using any portion of the System Restaurant Concepts licensed by this Agreement at any sites except the Location(s), and (b) may not make deliveries of products produced at the System Restaurants to any points outside the Delivery Area.

2.6 Protected Territories.

A. During the Term, and so long as Franchisee is not in default hereunder (including a breach or default under Appendix I hereto), PHI will not develop, franchise or license another to operate a Pizza Hut Restaurant within a circle centered on the Pizza Hut Restaurant that contains 15,000 households, but in no event will such circle of protection have a radius of less than 1 mile or greater than 10 miles.

B. As long as Franchisee is providing Adequate Delivery Service throughout the Delivery Area, PHI will not provide delivery service, and will not allow another franchisee or licensee to provide delivery service, for Approved Products using the Pizza Hut Marks to any point within the Delivery Area.

C. If Franchisee's Old Franchise Agreement was PHI's form of New Construction Franchise Agreement, then, with respect to each of the Pizza Hut Restaurants

identified on Appendix L hereto, until the expiration date of the original term of such Old Franchise Agreement:

> i)  PHI will not develop nor franchise or license another to develop any other restaurant concept that uses the Pizza Hut Marks at a "non-captive location," as defined below, that is within a one-mile radius of the Location; and

> ii)  PHI will not develop, franchise or license any such other restaurant concept that sells medium ("12 diameter") or larger pizzas using the Pizza Hut Marks from a "non-captive location" that is within the circle of protection as described in subsection 2.6.A., above.

For purposes of this Section, "non-captive locations" are only convenience stores, gas stations, grocery stores, and multi-branding accounts in which a non-traditional Pizza Hut outlet, such as a kiosk, is placed within a restaurant that is primarily identified by another trademark.

Except as set forth in this Section 2.6 and Section 2.7 below, Franchisee has no exclusivity and no rights to exclude development of concepts owned, franchised or licensed by PHI or its Affiliates. PHI and its Affiliates may develop and operate, or may franchise and license others to operate, any business concept except the System Restaurant Concepts at any place, including immediately adjacent to the Location(s), and may use the Pizza Hut Marks or any other trademarks owned or developed by PHI or its Affiliates in connection with those concepts, even if such concepts sell products that are the same as, or similar to, Approved Products.

**2.7  Right of First Refusal On New System Restaurants.**  Notwithstanding anything contained in this Agreement to the contrary, PHI hereby grants to Franchisee the following right of first refusal:

A.  If PHI identifies a development opportunity ("Development Opportunity") for a System Restaurant within a Single Site Region (as defined below) which includes the Locations(s) of Franchisee's System Restaurant(s), PHI will determine whether Franchisee operates the System Restaurant that is nearest to the Development Opportunity and is otherwise within the same general market area. If so, and unless PHI reasonably concludes that there are geographic obstacles within the market that would make development of the Development Opportunity by Franchisee impractical, PHI will offer the Development Opportunity to Franchisee. If Franchisee elects to accept the Development Opportunity, Franchisee must pay the applicable Initial Franchise Fee for such Development Opportunity within 90 days after receipt of PHI's offer and must agree to use its best efforts to expeditiously develop the Development Opportunity. If Franchisee does not accept the Development Opportunity by timely tendering payment of the Initial Franchise Fee, PHI may thereafter elect to develop the Development Opportunity itself or may offer the Development Opportunity to another. If Franchisee accepts PHI's offer as provided above, but does not begin construction of the Development Opportunity within 12 months after accepting PHI's offer, or does not open the Development Opportunity within 24 months after accepting PHI's offer, the Initial Franchise Fee paid by Franchisee shall be forfeited to PHI and the Development Opportunity shall terminate, and Franchisee shall have no further rights with respect thereto; provided, however, that if PHI

or its designee has not commenced construction of the Development Opportunity within 24 months after Franchisee was required to accept PHI's offer with respect to the Development Opportunity, or within 24 months after Franchisee abandons its decision to develop the Development Opportunity (as applicable), then PHI shall not thereafter develop the Development Opportunity without first offering such opportunity to Franchisee in accordance with the procedures set forth in this Section 2.7. Any Initial Franchise Fee initially paid to obtain a Development Opportunity and subsequently forfeited as provided above may be applied against payment of the Initial Franchise Fee if the same Development Opportunity becomes available to Franchisee as provided in the preceding sentence. Before granting a second right to obtain such same Development Opportunity, PHI may require reasonable assurances from Franchisee as to Franchisee's operational and financial capabilities and desire to complete the Development Opportunity. PHI shall not unreasonably reject a request by a Franchisee with respect to a Development Opportunity. Notwithstanding anything contained in this Section 2.7 to the contrary, in the event a delay in commencing construction of a Development Opportunity or in completing a Development Opportunity results from a force majeure (which may not include the inability to secure financing to pay for the completion of the Development Opportunity) (a "Development Opportunity Force Majeure Event"), then the deadline to commence construction of or complete the Development Opportunity, as applicable, shall be extended for a period of time equal to the duration of the Development Opportunity Force Majeure Event.

B.    The provisions of this Section 2.7 shall not be applicable with respect to markets in which PHI operates System Restaurants; provided, however, that if, after January 1, 2003, PHI has developed a System Restaurant in that market as a result of Franchisee's failure to exercise a Development Opportunity, then as to any future Development Opportunity as to which Franchisee may be the franchisee with the nearest System Restaurant, PHI need not offer such Development Opportunity to Franchisee if one of PHI's System Restaurants is nearer to the Development Opportunity than one of Franchisee's System Restaurants.

C.    For purposes of this Section 2.7, a "Single Site Region" shall be that portion of a Designated Market Area (as defined by A.C. Nielsen) that is not subject to a Territory Franchise Agreement, in which PHI has no System Restaurants, and one or more Single Site Franchisees operate System Restaurants; and a "Single Site Franchisee" shall be a franchisee who operates System Restaurants under a Pizza Hut Location Franchise Agreement.

2.8    Renewal Rights.

A.    Unless terminated as herein otherwise provided, Franchisee shall have the option at the expiration of the initial Term to renew the franchise granted hereunder for a renewal period of 20 years by executing PHI's form of Franchise Agreement as described in Section 2.8.B, provided that:

1.    Franchisee gives PHI written notice of its election to renew not less than 2 months nor more than 9 months prior to the expiration of the initial Term;

2.    Franchisee executes a general release under seal, in a form prescribed by PHI, of any and all claims against PHI, its affiliates, subsidiaries, shareholders, directors, officers, and employees;

-7-

App. 015

3. Franchisee, at the time of notice of election to renew and at the end of the initial Term, is not in default of any of the terms or conditions of this Agreement or any other agreement between Franchisee and PHI and its Affiliates, and has substantially complied with the terms and conditions of all such agreements during the Term;

4. All of Franchisee's accrued monetary obligations to PHI, and its Affiliates, have been satisfied prior to renewal, and timely met throughout the Term; and

5. Franchisee is in compliance with the standards set forth in PHI's then-current Manual and has made such modernization and renovations (including, without limitation, signs, furnishings, interior and exterior decor, fixtures, equipment, and structural changes) and repairs and maintenance to Franchisee's System Restaurants as PHI may have required and may require pursuant to Section H of Appendix I.

B. The franchise agreement to be executed at renewal may be different from this Franchise Agreement, to the extent that current business conditions warrant changes. No Initial Franchise Fee will be due upon renewal. The renewal form of franchise agreement shall:

i) provide that the amount of the service fee due thereunder for a Pizza Hut Restaurant shall be the Restaurant Competitive Rate, as hereinafter defined (if applicable), and the amount of the service fee due thereunder for a Delco Restaurant or a Delivery Restaurant shall be the Delco/Delivery Competitive Rate, as hereinafter defined (if applicable), and

ii) not include Appendix I except Section H and the definitions of Rebuild, Relocate, Remodel, and Reimage. All other obligations under Appendix I shall be deleted upon renewal.

C. For purposes of Section 2.8.B:

i) the Restaurant Competitive Rate shall not exceed the royalty rates being offered to new franchisees, for comparable services, as of one year prior to the renewal date, by franchisors of national full-service sit-down restaurant chains which have average unit sales volumes and average unit net operating cash flows comparable to those of Pizza Hut Restaurants; and

ii) the Delco/Delivery Competitive Rate shall not exceed the royalty rates being offered to new franchisees, for comparable services, as of one year prior to the renewal date, by franchisors of national pizza delivery chains which have average unit sales volumes and average unit net operating cash flows comparable to those of Delivery Restaurants and Delco Restaurants.

D. The Restaurant Competitive Rate and the Delco/Delivery Competitive Rate (the "Competitive Rates") shall be offered by PHI not later than nine (9) months prior to the expiration of the term of this Agreement, after consideration of the factors outlined in Section 2.8.C above. Unless IPHFHA reasonably determines that either or both of the offered rates offered by PHI exceed the Competitive Rates, as determined in accordance with Section 2.8.C. above and notifies PHI in writing, within sixty (60) days of PHI's written notice of the offered

rates, setting forth IPHFHA's objections and reasons therefor with respect to each or both of the rates offered by PHI, then IPHFHA shall be deemed to have accepted the rates offered by PHI as being reasonable and proper, and such rates shall be binding on PHI and Franchisee as the Competitive Rates. With respect to any of PHI's offered rates to which IPHFHA has objected on the basis set forth above, then thereafter for the following sixty (60) days, PHI and IPHFHA shall meet and attempt to resolve their disagreement with respect to the disputed rates identified by IPHFHA as exceeding the applicable Competitive Rates determined pursuant to Section 2.8.C. above. If, following such sixty (60) day period, IPHFHA does not agree that one or both of PHI's offered rates comply with the criteria set forth in Section 2.8.C. (the "Rates Criteria"), then IPHFHA may file a demand for arbitration with the Center of Public Resources, Inc., ("CPR"), asking the arbitrator to settle the dispute in accordance with the following principles. First, both PHI and IPHFHA shall fully participate in the arbitration and shall have the right to submit whatever evidence and arguments they believe support their respective positions, including without limitation their offered rates and the applicable market conditions. As a threshold matter, the arbitrator, after reviewing the parties' submissions, shall rule that either one or both of PHI's offered rate(s) are or are not in compliance with the Rates Criteria. If the arbitrator rules that one or both of PHI's offered rates are in compliance with the Rates Criteria for either the Restaurant Competitive Rate or the Delco/Delivery Competitive Rate, or both, as applicable, then PHI's offered rate with respect to either or both, as applicable, shall become the Restaurant Competitive Rate or Delco/Delivery Competitive Rate, as applicable. If the arbitrator rules against PHI on either or both of such offered rates, then the arbitrator shall rule whether one or both of IPHFHA's offered rates are in compliance with the Rates Criteria. The arbitrator shall be free to accept none, either or both of PHI's or IPHFHA's offered rates as the applicable Competitive Rates. As to any offered rates for which the arbitrator has rejected both PHI's and IPHFHA's offered rates as failing to meet the Rates Criteria, PHI and IPHFHA shall recommence the process described above for establishing such Competitive Rates. The arbitrator shall issue his ruling(s) within twenty (20) days after the conclusion of each hearing. The arbitrator's ruling(s) shall be binding on PHI and Franchisee, unless the arbitrator has failed to follow the requirements of this provision. For purposes of this Section 2.8.D, the arbitrator's fees and expenses and the other administrative expenses of the arbitration shall be shared equally by PHI and IPHFHA.

E.    If CPR shall cease to exist or refuse to arbitrate such dispute, PHI and IPHFHA shall have the right to jointly appoint a substitute neutral organization to arbitrate such dispute, and the rules of such substitute organization shall govern such arbitration. Except as provided below, the arbitration shall be conducted in accordance with CPR's (or its substitute's) rules of commercial arbitration. The decision of the arbitrator shall be binding upon PHI and Franchisee. The arbitration shall be conducted at a place designated by the Arbitrator.

2.9.    Notice of Intent Not to Renew.  No later than 2 years prior to the expiration of this Agreement, PHI will notify Franchisee in writing whether or not Franchisee appears then to be eligible to renew the franchise granted hereunder. If PHI advises Franchisee that the franchise is not eligible for renewal, it will specify the reasons for such ineligibility. One year thereafter, PHI will provide a similar notice to Franchisee specifying whether any deficiencies noted in the prior notice have been cured. In no event shall the provisions of Section 2.9 relieve Franchisee from the requirements of Section 2.8.A or in any way affect PHI's rights and remedies under Sections 18 and 19.

Location Franchise Agreement

App. 017

## 3. DESIGNATION AND USE OF MARKS

3.1     <u>Designation of Pizza Hut Marks</u>.  PHI may, from time to time, designate new Pizza Hut Marks as applicable to the System Restaurants.   In addition, PHI may, from time to time, modify or delete existing Pizza Hut Marks. PHI will give Franchisee written notice of the addition, modification, or deletion of Pizza Hut Marks. Franchisee will cease use of any deleted Pizza Hut Marks within the time stated in the notice of deletion. PHI now owns and may in the future own marks that are not Pizza Hut Marks. Franchisee will have absolutely no right to use any mark owned or controlled by PHI except the Pizza Hut Marks.

3.2     <u>Use of Pizza Hut Marks</u>.  The franchise granted to Franchisee to use the Pizza Hut Marks is applicable only to Franchisee's System Restaurants located at the Location(s), except that Franchisee may use the Pizza Hut Marks in connection with advertisements for the System Restaurants and may deliver products produced at the System Restaurants throughout the Delivery Area.  Franchisee will use the Pizza Hut Marks strictly according to the terms and conditions of this Agreement. Franchisee may not offer or sell any food, beverage, or other product (whether or not an Authorized Product) at or from any System Restaurant under or in connection with any trademark, service mark, trade name, or trade dress (including product package design) other than the Pizza Hut Marks, without PHI's prior, written consent in each case. Franchisee will cause all point of purchase materials and all other paper goods, all exterior/interior signage, and all promotional and advertising materials to bear the Pizza Hut Marks as instructed by PHI.

3.3     <u>Ownership of Pizza Hut Marks</u>.  PHI is the sole and exclusive owner of the Pizza Hut Marks. Nothing contained in this Agreement vests in Franchisee any interest in any of the Pizza Hut Marks, other than the limited license granted by this Agreement. All goodwill now or in the future associated with and/or identified by one or more of the Pizza Hut Marks (including any goodwill arising out of Franchisee's use of the Pizza Hut Marks) belongs directly and exclusively to PHI.

Franchisee may not interfere in any manner with, and will not attempt to attack, contest, or prohibit, (a) any use of the Pizza Hut Marks by PHI or by any other franchisee or licensee of PHI that is not directly contrary to the terms of this Agreement, or (b) PHI's ownership of the Pizza Hut Marks. The provisions of this Section 3.3 will survive the termination or expiration of this Agreement.

3.4     <u>Protection of Pizza Hut Marks</u>.   Franchisee will immediately notify PHI, in writing, if (a) a third party claims that the Pizza Hut Marks infringe trademarks owned by the third party, or otherwise challenges Franchisee's use of the Pizza Hut Marks, or (b) Franchisee knows or suspects that a third party is infringing the Pizza Hut Marks. Franchisee will provide PHI with any information available to Franchisee about the matter.

PHI will use reasonable efforts to protect the Pizza Hut Marks, including (in its sole and absolute discretion) instituting, prosecuting, and/or settling judicial or administrative actions or proceedings. Whenever requested to do so by PHI, Franchisee will cooperate fully in those actions or proceedings. Franchisee may not, however, take any action with respect to any challenges against Franchisee's use of the Pizza Hut Marks, or any known or suspected

infringements of the Pizza Hut Marks by other parties, without PHI's prior, written approval (which PHI may grant or withhold in its sole discretion). Franchisee will exercise caution in its use of the Pizza Hut Marks to ensure that the Pizza Hut Marks (and the goodwill associated with them) are not jeopardized in any manner. Franchisee may not use the Pizza Hut Marks in any manner or in connection with any statement or material that is (in PHI's reasonable judgment) in bad taste or inconsistent with PHI's public image, or that could tend to involve PHI in a matter of political or public controversy, or tend to bring disparagement, ridicule, or scorn upon PHI, the Pizza Hut Marks, or the goodwill associated with the Pizza Hut Marks.

## 4. TRAINING AND ASSISTANCE

### 4.1    Management Training Programs.

A.    PHI Programs. PHI will offer a training program for Franchisee and the managers of Franchisee's System Restaurants, at locations and at times selected by PHI. The training programs, which may include more than one segment, will be structured to provide practical training in the implementation of the System Restaurant Concepts, and the operation of System Restaurants. PHI will bear the costs of providing the actual training programs, including the overhead costs of training, staff salaries, materials, and all technical training tools. Franchisee will pay all traveling, living, compensation, and other expenses incurred by Franchisee, or Franchisee's employees in connection with attendance at the training programs. The course content, format, operation, and manner of conducting these training programs will be in the sole control of PHI.

B.    Training Mandatory. Franchisee will not allow any of Franchisee's System Restaurants to be managed by any person who has not successfully completed PHI's management training course. If a manager dies, resigns, or is terminated, Franchisee will not be in default of this requirement if the successor manager begins the required training course within 90 days after first assuming the duties of a manager and successfully completes the course.

C.    Independent Training Programs. Franchisee may request that PHI approve a management training program proposed by Franchisee as an alternate method of complying with this Section 4.1. PHI has no duty to review Franchisee's program unless Franchisee pays all costs of PHI's review. PHI has no duty to approve Franchisee's program unless Franchisee satisfies PHI that Franchisee's program is at least the equivalent of PHI's program. PHI may revoke its approval of Franchisee's training program whenever, in PHI's opinion, the training program fails to satisfy this standard.

## 5. MANUAL

5.1    Loan of Manual. PHI will loan to Franchisee, at no charge, one complete set of the applicable portions of the Manual for each System Restaurant. Franchisee may borrow from PHI further copies of some or all portions of the Manual, upon payment of the fee set by PHI.

5.2    Ownership of Manual. All copies of the Manual will remain the exclusive property of PHI. Franchisee may not copy, and will prevent all Persons, including Franchisee's employees and Related Persons, from copying, any portion of the Manual. Franchisee will return

-11-

Location Franchise Agreement

App. 019

to PHI, at the end of the Term, all copies of the Manual in the possession of Franchisee, Franchisee's employees or its Related Persons.

5.3    Confidentiality of Manual. The entire contents of the Manual constitute PHI's confidential trade secrets. Franchisee may not, and will use its best efforts to ensure that no other Persons disclose or use (except as authorized by this Agreement), any of the contents of the Manual or any other trade secrets of PHI, whether during or after the Term.

5.4    Protection of Trade Secrets. The information contained in the Manual is a trade secret; disclosure of any of the information contained in the Manual would cause irreparable harm to PHI. PHI is entitled to obtain injunctive relief against Franchisee, without posting bond or other security, to protect the contents of the Manual from disclosure and improper use. Franchisee waives all defenses it might otherwise have to equitable relief for this purpose.

5.5    Updates. PHI may, from time to time, update, correct or modify the Manual. Franchisee will follow any instructions from PHI concerning those updates, corrections and modifications, including instructions to remove and replace certain pages contained in the Manual, and instructions to destroy or to return to PHI the old (or removed) pages or volumes. If there is ever a disagreement about the proper contents of the Manual, the master copy of the Manual kept by PHI at its home office is conclusively the controlling version.

## 6. STANDARDS; DUTIES OF FRANCHISEE

6.1    Interpretation of Standards. PHI has sole discretion to interpret the standards that it sets forth in the Manual or elsewhere.

6.2    Promulgation of Standards. In the Manual, PHI has promulgated standards of operation for each type of System Restaurant. PHI has also promulgated standards of usage for the Pizza Hut Marks, and other standards intended to ensure the consistency of the System Restaurant Concepts. PHI may, from time to time, add to, delete, or change standards. Franchisee will comply with any change in the standards within the timeframe set by PHI. At all times throughout the Term, Franchisee will comply with all standards then current.

6.3    Limitation on Promulgation of Standards. Franchisee shall Remodel, Rebuild, Relocate, Reimage and Refurbish its Pizza Hut Restaurants subject to this Agreement in accordance with the provisions of Appendix I.

6.4    Inspections. PHI's authorized representatives may enter upon the premises of Franchisee's System Restaurants at any time during the System Restaurant's normal business hours, and at any other reasonable time, for the purpose of determining whether the business is being conducted in accordance with PHI's standards, the Manual and the terms of this Agreement.

If any inspection indicates any deficiency, Franchisee will correct or repair the deficiency within 48 hours after Franchisee receives a written report of the deficiency from PHI. If (a) the deficiency is one that Franchisee has a right to cure under Section 18.2 and (b) the deficiency cannot be cured within 48 hours, Franchisee will not be in default if Franchisee begins the necessary corrections or repairs within the 48-hour period, and diligently pursues the work to

-12-

completion. If the deficiency is one that imminently threatens the health or safety of Franchisee's employees or the consuming public, PHI may (instead of terminating this Agreement as allowed by Section 18.1) require Franchisee to cease operating the affected System Restaurant until the deficiency is corrected. If Franchisee does not cure the deficiency within the permitted time, PHI may make, or hire someone else to make, the corrections or repairs. Franchisee will reimburse PHI, upon demand, for all of PHI's repair expenses.

6.5    Compliance with Laws.  Franchisee will comply with all applicable laws and regulations governing the operation of its System Restaurants.

6.6    Identification.  Franchisee will maintain PHI-approved signage, identifying the System Restaurant as a PIZZA HUT restaurant, and giving any other information that PHI requires. In addition, Franchisee will prominently post a PHI approved sign inside each System Restaurant, stating Franchisee's name and stating that the System Restaurant is operated by Franchisee under a franchise from PHI.

6.7    Uniforms.  Franchisee will require all employees, while working in any System Restaurant, to: (a) wear uniforms of the color, design, and other specifications that PHI designates from time to time; and (b) present a neat and clean appearance.

6.8    Coin-Operated Machines.  Franchisee may not permit any vending, game, audio, video, other coin- or currency-operated machines, or any other service, product, or entertainment machine of any kind (whether or not similar to those listed), to be installed or maintained on the premises of Franchisee's System Restaurants without PHI's prior written approval. Unless otherwise provided in the Manual, PHI consents to the installation in each System Restaurant of up to the following numbers of coin-operated machines:

**Pizza Hut Restaurants:**
> Two newspaper vending machines
> Two coin telephones
> One video game machine
> One audio jukebox
> One cigarette vending machine

**Delivery and Delco Restaurants:**
> Two newspaper vending machines
> One coin telephone
> One video game machine

The portion of receipts from all coin-operated machines located on the premises of a System Restaurant that is payable as directed by Franchisee (even if paid by the vendor directly to the unit's manager) is part of Gross Sales.

6.9    Assumed Name Certificate.  Franchisee will promptly file and publish, in all states and counties in which Franchisee does business, a certificate of doing business under an assumed or fictitious name. Franchisee will indicate in each certificate that it is doing business as "Pizza Hut" under a franchise from PHI. Franchisee will furnish a certified copy of each certificate to PHI promptly after its filing.

Location Franchise Agreement

-13-

6.10    Approved Products. Franchisee may not manufacture, advertise for sale, sell, or give away from any System Restaurant any product except Approved Products. All Approved Products will be distributed under the specific name or Mark (if any) approved by PHI.

6.11    Standard and Optional Items. Franchisee will offer for sale in each of its System Restaurants all Approved Products that PHI designates as "standard" for the type of System Restaurant, unless PHI agrees otherwise in writing. In addition, Franchisee may offer Approved Products designated by PHI as "optional" for the System Restaurant in which offered.

6.12    Menu Modification. Any time PHI notifies Franchisee that an item will become a "standard" Approved Product, or that an item will no longer be an Approved Product (either "standard" or "optional"), PHI will include a deadline by which Franchisee must offer the new "standard" Approved Product for sale, or must cease selling the item that is no longer an Approved Product. The deadline will be at least 90 days after PHI gives Franchisee the notice, in the case of a new "standard" Approved Product, and at least 30 days after PHI gives Franchisee the notice, in the case of a product that is no longer an Approved Product.

6.13    No Unprepared Products. Franchisee may not sell or distribute any food product or ingredient except as a complete and fully prepared food product ready for immediate consumption.

6.14    Point-of-Sales System. Franchisee acknowledges that it is currently using PHI's Single Unit System under a License and Support Agreement with PHI which requires Franchisee to pay PHI's standard support and maintenance fees, or another computerized point-of-sales system that PHI may have approved. Franchisee shall have the right to utilize other point-of-sales and back office systems ("Technology Systems") which shall be compatible with the data reporting systems used by PHI. Such Technology Systems shall have functionality which will permit the performance of tasks set forth on Appendix H. PHI may, at any time, access Franchisee's Technology Systems and retrieve, analyze, download and use all software, data and files stored or used thereon.

6.15    Prices. Franchisee will establish, in its sole discretion, prices for all Approved Products sold by Franchisee.

## 7. ADVERTISING

7.1    National Advertising.

A.    Advertising Fund. Subject to the remainder of this Section 7.1, Franchisee will make a monthly payment to PHI (for the Advertising Fund) in an amount not more than 3% but in no event less than 2.5% of Franchisee's Gross Sales from each System Restaurant for the prior month. PHI will use the Advertising Fund to develop and administer advertising, promotional, and marketing programs designed to promote and enhance the collective success of all System Restaurants, except that PHI, in its sole discretion, may rebate some or all of the Advertising Fund to Franchisee and other franchisees for use in local marketing. PHI need not expend payments to the Advertising Fund in the same year that they are received, and need not prove that Franchisee received any benefit from Franchisee's payments to the Advertising Fund. PHI's good faith decisions regarding expenditure of the Advertising Fund will be final and

binding. PHI may, in its sole discretion, seek input from Franchisee or other franchisees regarding expenditure of the Advertising Fund.

      **B.**    <u>IPHFHA</u>.  On the date of this Agreement, PHI is a party to an agreement dated March 31, 1975 (as subsequently amended) with IPHFHA concerning advertising for System Restaurants (the "Advertising Committee Agreement"). During the period that the Advertising Committee Agreement is in force, Franchisee will be a member of IPHFHA, will abide by the constitution, bylaws, rules and regulations of IPHFHA, and will timely pay the dues that IPHFHA assesses its members for contribution to the national advertising fund administered by the Advertising Committee under the Advertising Committee Agreement. The amount that Franchisee pays as dues to IPHFHA for contribution to the national advertising fund administered by the Advertising Committee under the Advertising Committee Agreement will be credited, dollar for dollar, toward Franchisee's national advertising obligations set forth in Section 7.1.A. PHI will remit all of the national advertising payments that Franchisee makes to PHI to the Advertising Committee. At any time that IPHFHA holds a vote concerning the dues to be paid by its members, Franchisee will exercise all of Franchisee's voting power to implement a dues rate equal to 2.5% of the prior month's Gross Sales.

      **C.**    <u>Delegation of Authority</u>.  During the period that the Advertising Committee Agreement is in force, PHI may delegate its authority over, and control of, the Advertising Fund to the Advertising Committee. During the period of this delegation, PHI will have no responsibility for the Advertising Fund, or for the decisions made by the Advertising Committee. PHI will nonetheless retain final control over all uses of the Pizza Hut Marks.

**7.2**    <u>Local Advertising</u>.  In addition to the payments required by Section 7.1, Franchisee will expend funds on local advertising in the general marketing area of Franchisee's System Restaurants each month. The amount of these monthly expenditures will be the difference between 4.25% of Franchisee's prior month's Gross Sales and the amount paid by Franchisee for national advertising pursuant to Section 7.1 above. Such local advertising shall be confined to broadcast media, subject to PHI's prior written consent.

**7.3**    <u>Approval of Advertising</u>.  All advertising copy and other materials used by Franchisee will be in strict conformity with the standards, formats, and specimens contained in the Manual or otherwise established by PHI. Franchisee may not use any design, advertisement, sign, or form of publicity, unless first submitted to PHI and approved by PHI in writing (except with respect to prices), and not later disapproved. Any request by Franchisee for PHI's approval will be addressed to PHI (marked, "Attention: Advertising Department - Ad Review"), and PHI will endeavor to respond within 30 days. Whenever Franchisee elects to use, in the manner and time frame intended by PHI, advertising supplied by PHI or a promotional item specifically approved by PHI, Franchisee may use that advertising or promotional item without further approval.

      Upon written notice from PHI, Franchisee will immediately discontinue use of any unapproved advertising materials. If Franchisee does not discontinue and remove the unapproved materials within 5 days after notice, PHI or its authorized agents may, at any time, enter upon the premises of Franchisee's System Restaurants or elsewhere and remove and destroy the materials without paying for them and without being liable for trespass or other tort.

-15-

7.4     Cooperative Advertising.  PHI may, from time to time, establish cooperative advertising associations ("Co-ops") for various groups of System Restaurants. PHI may establish or modify Co-ops based upon marketing areas, type(s) of System Restaurants, or any other criteria chosen by PHI in its sole discretion. If PHI elects to establish Co-ops, it may, from time to time, direct Franchisee to join one or more Co-ops and to contribute some or all of Franchisee's local advertising money (otherwise required to be expended by Franchisee pursuant to Section 7.2) to one or more of the Co-ops. The monthly contributions to a Co-op (if any) required by this Section 7.4 will be made on or before the 20th day of each month, based on the prior month's Gross Sales of each of Franchisee's System Restaurants in the Co-op. PHI reserves the right to establish bylaws, voting rules, membership agreements, standard advertising agency agreements, and other standards concerning the operation of Co-ops, advertising agencies retained by Co-ops, and advertising programs conducted by Co-ops.  The contribution rate for any Co-op may be increased at any time, but only upon approval of the members of the Co-op in accordance with its bylaws or operating procedures.

7.5     Limitation on Aggregate Amount of Advertising Contributions.  Notwithstanding anything contained in this Section 7 to the contrary, in no event shall Franchisee's aggregate advertising fee rates for national and cooperative advertising be required to exceed four and one-fourth percent (4.25%).  The first two and one-half percentage points of such aggregate advertising fees shall be applied toward payment of Franchisee's national advertising obligations (including IPHFHA dues, as referred to in Section 7.1.B), and the balance of such advertising fees shall be applied toward payment of Franchisee's cooperative advertising obligations.

## 8.     PURCHASE OF EQUIPMENT, SUPPLIES AND OTHER PRODUCTS

8.1     Use of Approved Supplies and Approved Distributors.  PHI may, from time to time, publish one or more listings of approved equipment, supplies, and distributors, which listings may be specific as to manufacturer, brand name, item/model/catalog number, preparation or manufacturing facility, or other factors considered relevant by PHI. PHI may add to or delete from the listings at any time. Franchisee will only purchase and use approved equipment and supplies in connection with Franchisee's operations under this Agreement, and will obtain all equipment and supplies only from or through approved distributors. If Franchisee desires to purchase any equipment or supplies that are not then approved, or to purchase any items from or through a distributor that is not then approved, Franchisee will submit to PHI a written request for approval. PHI may inspect the facilities of the manufacturer, producer, or distributor, and may require Franchisee (or the manufacturer, producer, or distributor) to submit samples, specifications, and other information concerning any equipment or supplies for which approval is sought. PHI is not required to inspect or test any proposed manufacturer, producer, or distributor until PHI is satisfied that all costs associated with inspection and testing of the proposed manufacturer, producer, or distributor and of samples of their products (including salaries of PHI employees, travel costs, and laboratory charges) will be borne by Franchisee (or the manufacturer, producer, or distributor). PHI may re-inspect the facilities and products of any approved manufacturer, producer, or distributor from time to time, and may revoke its approval upon failure to continue to meet any of PHI's criteria as then in effect.

8.2     Purchasing Co-op.  So long as this Agreement is in effect, Franchisee shall become and remain a member of the Pizza Hut National Purchasing Coop, Inc. or its successors

(the "Purchasing Coop"), and abide by its Certificate of Incorporation and Bylaws as in effect from time to time, including without limitation the provisions of Section 2.6 of the Bylaws concerning purchase commitments. A copy of the current Section 2.6 of the Bylaws is attached hereto as Appendix K. Franchisee's obligation to become and remain a member of the Purchasing Coop shall terminate upon dissolution of the Purchasing Coop, or if an agreement is reached between PHI and IPHFHA to delete from this Agreement the requirement that Franchisee become and remain a member of the Purchasing Coop.

## 9. FEES AND PAYMENT SCHEDULE

9.1. <u>Initial Franchise Fee</u>. No initial franchise fee (the "Initial Franchise Fee") shall be due with respect to any System Restaurant subject to this Agreement as of its effective date. For any new System Restaurant at a Location that Franchisee develops after the effective date (other than Remodels, Rebuilds and Relocations pursuant to Appendix I) that falls under the terms of this Agreement, whether pursuant to Section 2.7 or otherwise, Franchisee will pay PHI an Initial Franchise Fee of $15,000 for each Pizza Hut Restaurant and $25,000 for each Delivery Restaurant or Delivery/Carryout Restaurant. Such Initial Franchise Fees will be earned when due, and will not be refundable, in whole or in part, under any circumstances. The entire Initial Franchise Fee, when due, is payable before the System Restaurant opens.

9.2. <u>Monthly Service Fees</u>. A. Except as provided in Section 9.2.B, Franchisee will pay PHI monthly an amount (the "Monthly Service Fee") equal to 6.5% of Franchisee's Gross Sales from each System Restaurant for the prior month. If applicable law prohibits Franchisee from paying PHI a percentage of Franchisee's revenues from the sale of alcoholic beverages, Franchisee will pay PHI monthly an amount equal to 7.0% of Franchisee's Gross Sales (excluding from those Gross Sales, however, all revenues from the sale of alcoholic beverages) from each System Restaurant in the affected jurisdiction for the prior month. Franchisee will pay all Monthly Service Fees on or before the 20th day of the month. If PHI has not received the fee by the last day of the month in which the payment is due, Franchisee will pay a "late charge" equal to 1.5% of the delinquent amount (or such lesser amount as PHI may designate) and an equal late charge for each subsequent month that payment is delayed. PHI may apply any payments received from Franchisee to the oldest amounts due from Franchisee, regardless of any contrary designation by Franchisee.

B. Notwithstanding the provisions of Section 9.2.A, the Monthly Service Fee rate for any Pizza Hut Restaurant which is Relocated, Rebuilt or Remodeled as provided in Appendix I shall be reduced by 2.5 percentage points effective upon commencement of operations at the Relocated, Rebuilt or Remodeled Pizza Hut Restaurant; except that as to a Remodeled Pizza Hut Restaurant, if Franchisee agrees to Remodel such Pizza Hut Restaurant, but such Remodeling is not completed prior to July 1, 2006, then the Monthly Service Fee rate shall be reduced by 1.5 percentage points unless the delay in completing such Remodeling results from a force majeure (which specifically may not include the inability to secure financing to pay for such Remodeling) (a "Remodeling Force Majeure Event"). If a Remodeling Force Majeure Event occurs, then the deadline to open the Remodeled Pizza Hut Restaurant in order to obtain a 2.5 percentage point reduction in the Monthly Service Fee Rate shall be extended for a period of time equal to the duration of the Remodeling Force Majeure Event.

9.3   Transfer Fees.  As partial reimbursement of PHI's costs of review and approval of a Transfer of any Interest in Franchisee or in this Agreement, Franchisee will pay PHI, on or before the effective date of each Transfer, and as a condition to PHI's approval, a transfer fee equal to $2,500 plus an additional $250 for each Location covered by this Agreement (whether or not Franchisee is then operating a System Restaurant at any Location).

9.4   Offset Rights.  At any time that Franchisee or its Related Persons are 30 days or more delinquent in paying any sums owed to PHI or its Affiliates, PHI may offset any sums owing by PHI against monies owed by Franchisee or its Related Persons.

9.5   Taxes.  In addition to the other payments provided for in this Agreement, Franchisee will pay PHI, or its Affiliates, all sales taxes, personal property taxes, excise taxes, value added taxes and similar taxes imposed upon or required to be collected or paid by PHI, or its Affiliates, on account of services or goods furnished to Franchisee through sale, lease or otherwise, or on account of collection by PHI of the Initial Franchise Fees or Monthly Service Fees called for by this Agreement. Franchisee shall pay such taxes upon demand and in the manner designated by PHI, or its Affiliates.

## 10. BUSINESS PREMISES

10.1   Restrictions on Use.  Unless Franchisee receives PHI's prior written consent, Franchisee will conduct from the premises of each of Franchisee's System Restaurants (including any adjacent sidewalks and parking areas) only business activities licensed by this Agreement.

10.2   Site Selection.  Franchisee is solely responsible for selecting sites at which to develop System Restaurants. PHI will not be liable to Franchisee if a location chosen by Franchisee fails to be profitable or otherwise fails to meet Franchisee's expectations.

10.3   Construction of System Restaurants.   Franchisee will obtain all necessary governmental permits and licenses before constructing, modifying, or remodeling any System Restaurant. Franchisee will complete any construction or other work on each System Restaurant within a reasonable time after Franchisee begins work on that System Restaurant. Franchisee will begin operation of each new System Restaurant within 30 days after completion of construction, and will give PHI at least 10 days written notice before beginning operations.

10.4   Right to De-Identify.  If the premises at which a System Restaurant is operated are leased, the lease will contain an express right of de-identification, in the following form:

> Upon termination or non-renewal of this Lease, Lessee/Tenant may deidentify the leased premises. If Lessee/Tenant fails to do so, Pizza Hut, Inc. is given the express right to deidentify. Deidentification consists of removal of all signs; modification or remodeling of all identifying architectural features (by removing the cupola from the roof, replacing any trapezoidal windows with rectangular windows, and similar actions); repainting as necessary to no longer use the color scheme used by Pizza Hut, Inc.; and any other steps necessary (in the sole discretion of Pizza Hut, Inc.) to

-18-

App. 026

effectively distinguish the formerly leased premises from Pizza Hut, Inc.'s proprietary building design(s). All deidentification will be done without cost to Lessor/Landlord.

10.5 Repair and Maintenance. Franchisee will repair and repaint the interior and exterior of all System Restaurants as appropriate and as requested by PHI. Franchisee will, at all times, maintain the interior and exterior of the System Restaurants as well as the surrounding premises in a clean and orderly condition. If Franchisee leases the locations on which the System Restaurants are located, Franchisee will require the leases to contain an express right to undertake this repair and maintenance.

10.6 Proof of Compliance. Before opening each System Restaurant, Franchisee will provide to PHI either a copy of a deed showing that title to the real estate on which the System Restaurant will be located is held by Franchisee, or a letter from the landlord of the premises in the form of Appendix C.

10.7 System Restaurant Closure. Franchisee may not cease to operate any System Restaurant without PHI's prior consent, except upon condemnation or expiration of a lease pursuant to its terms at execution. Franchisee acknowledges that the damages to PHI from unauthorized closure of a System Restaurant are difficult to calculate; therefore, if Franchisee violates this Section 10.7, Franchisee will pay as liquidated damages, and not as a penalty, an amount equal to 24 times the average Monthly Service Fees paid or due with respect to the closed System Restaurant during the calendar year before the closing. If the System Restaurant was not open for business for a full calendar year, the liquidated damages will be 24 times the highest Monthly Service Fee during the period the System Restaurant was open.

## 11. BOOKS AND RECORDS; REPORTS; AUDITS

11.1 Maintenance of Books and Records. Franchisee will keep on the premises of each of Franchisee's System Restaurants or at Franchisee's principal place of business, and will preserve for at least 5 years after the date of their preparation (regardless of any intervening expiration or termination of this Agreement), true and accurate records, ledgers, accounts, books, and data in the form that PHI requires. Franchisee's records will accurately reflect all details relating to the business done at each System Restaurant.

11.2 Reports. Once each week (on approximately the same day), Franchisee will report to PHI (by telephone, by facsimile, or by another method approved by PHI) Franchisee's Gross Sales, on a unit-by-unit basis, for the week (seven day period) ending no more than five days before the date of the report. With its payment of the monthly service fees (in accordance with Section 9.2), Franchisee will submit to PHI, in writing, a monthly statement of Gross Sales. Within 45 days after the close of each fiscal quarter, Franchisee will submit to PHI, in writing, a quarterly profit and loss statement, on a unit-by-unit basis. The preceding Franchisee weekly reporting obligations shall be satisfied if Franchisee consents in writing to PHI accessing Franchisee data directly, as provided in Section 6.14, and Franchisee's reporting information, as described, is reasonably accessible to PHI.

In addition to the reports described above, Franchisee will, within 90 days after the end of each of Franchisee's fiscal years, provide PHI with a complete annual profit and loss statement

and a consolidated balance sheet prepared in accordance with generally accepted accounting principles, consistently applied. If requested by PHI, the annual profit and loss statement and balance sheet will be reviewed by an independent certified public accountant in accordance with the Statements on Standards for Accounting and Review Services, and will contain a signed opinion by the accountant to that effect. PHI reserves the right to require any further information about Franchisee's business under this Agreement that PHI from time to time reasonably prescribes. PHI will take reasonable precautions to maintain the confidentiality of all financial reports provided by Franchisee, but if Franchisee executes any promissory notes to PHI, PHI may disclose the financial reports provided by Franchisee to any third party to whom PHI sells or pledges (or attempts to sell or pledge) the promissory notes from Franchisee.

11.3    Inspection and Audit.   PHI and its agents or representations may examine and audit all of Franchisee's records, accounts, and books at all reasonable times. Franchisee will cooperate with any examination or audit by gathering records, accounts, and books for easy access, and by providing other assistance PHI reasonably requests. If any inspection or audit discloses that any financial statement delivered to PHI by Franchisee is in error, Franchisee will immediately pay to PHI any deficiency found to be owing, plus a finance charge at the maximum rate permitted by law, accruing from the date payment was first due. If the deficiency is 2% or more of the amount due, then in addition, Franchisee will reimburse PHI for the cost and expense of the inspection or audit within 5 business days after receiving a bill from PHI.

11.4    Selection of Accountants.   Franchisee will use the accounting services of a national or large regional firm of certified public accountants selected by Franchisee, or another accounting service reasonably satisfactory to PHI. Franchisee will notify PHI of the name and qualifications of any accounting service (other than a national or large regional firm of certified public accountants) selected by Franchisee; that accounting service will be considered satisfactory to PHI unless, within 30 days after PHI's receipt of Franchisee's notice of the name and qualifications of the accounting service, PHI notifies Franchisee of PHI's objection to the accounting service. PHI may withdraw its approval of any accounting service (including national and large regional firms) upon reasonable advance notice to Franchisee.

# 12. COVENANTS AGAINST COMPETITION

12.1    Acknowledgments.   Franchisee acknowledges:

A.    Uniqueness.   The food products, methods of doing business, and other elements composing the System Restaurant Concepts (including the information set forth in the Manual) are distinctive, and have been developed by PHI at great effort, time, and expense.

B.    Secret Information.   Franchisee has regular and continuing access to valuable and confidential trade secrets regarding the System Restaurant Concepts, and to PHI's knowledge, know-how, and expertise concerning the operation of a retail food business. It would be an unfair method of competition for Franchisee to use or duplicate any of PHI's trade secrets, knowledge, know-how, or expertise for any use other than operations pursuant to this Agreement.

Location Franchise Agreement

12.2 <u>In-Term Covenants</u>. During the Term, Franchisee and its Related Persons may not (without the prior, written consent of PHI), directly or indirectly, individually or as a partner, joint venturer, shareholder, officer, creditor, director, employee, trustee, or agent of an organization, own, operate, finance, or provide consulting services to any business (other than a System Restaurant operated pursuant to this Agreement) engaged in the business of operating restaurants (including the delivery and carryout aspects of restaurants) that sell pizza, pasta or other food items similar to Approved Products.

During the Term, Franchisee and its Related Persons may not (without the prior, written consent of PHI) lease, sublease, or otherwise permit the use of, any portion of any premises owned, leased, or controlled by any of them for purposes of operating a business (other than a System Restaurant operated pursuant to this Agreement) engaged in whole or substantial part (more than 10% of its sales), in the production or sale (at wholesale or retail) of any pizza, pasta, or other food items similar to Approved Products.

12.3 <u>Post-Term Covenants</u>. For a period beginning on the termination or expiration of this Agreement and ending on the date specified below, neither Franchisee nor its Related Persons may engage, nor assist others to engage, directly or indirectly, individually or as a partner, joint venturer, shareholder, officer, creditor, director, employee, or agent, in the production or sale (at wholesale or retail) of any pizza, pasta or other food items similar to Approved Products: (a) within a 25-mile radius of any Location; (b) anywhere within the county within which one or more Locations are situated; or (c) anywhere within 10 miles of a location in the United States at which PHI or any subsidiary, Affiliates or franchisee of PHI operates a System Restaurant on the date of termination or expiration of this Agreement.

For a period beginning on the date any Person Transfers all of its Interest in Franchisee or in this Agreement, and ending on the date specified below, the transferring Person may not engage, directly or indirectly, individually or as a partner, joint venturer, shareholder, officer, creditor, director, employee, or agent, in the production or sale (at wholesale or retail) of any pizza, pasta or other food items similar to Approved Products: (a) within a 25-mile radius of any Location; (b) anywhere within the county within which one or more Locations are situated; or (c) anywhere within 10 miles of a location in the United States at which PHI or any subsidiary, Affiliates or franchisee of PHI operates a System Restaurant on the date of termination or expiration of this Agreement.

As to each of the covenants, and any Person bound by the covenants, contained in this Section 12.3, the covenant will expire on the date the Person has been in full compliance with the covenant for 18 consecutive months. Each of the covenants set forth in the foregoing paragraphs are independent of the others, and the unenforceability of one will not affect the others.

12.4 <u>Perpetual Covenant</u>. In addition to the covenants of confidentiality contained in Section 5.3, Franchisee and its Related Persons may never (whether during or after the Term) take any actions that would have the probable effect of impairing PHI's ownership of or goodwill in the Pizza Hut Marks and/or in the System Restaurant Concepts.

-21-

App. 029

**12.5** **Stock Ownership.** The limitations on being a direct or indirect owner or shareholder of a business, as contained in this Section 12, do not apply to ownership of 1% or less of the issued and outstanding stock in any corporation traded on a national stock exchange.

## 13. EMPLOYMENT RELATIONS

**13.1** **Franchisee's Employees.** Franchise will be solely responsible for all of Franchisee's employment practices, including hirings, terminations, and other personnel actions. Franchise will protect, defend, and indemnify PHI, its affiliates, officers, and employees, from any and all proceedings, claims, and causes of action instituted by Franchisee's employees, or by others, that arise from Franchisee's employment practices.

**13.2** **Interference.** During the Term, neither PHI nor Franchisee may employ, directly or indirectly, any individual in a managerial position who is at the time, or was at any time during the prior 6 months, employed in a managerial position by the other party, nor may Franchisee employ, directly or indirectly, any individual in a managerial position who is at the time, or was at any time during the prior 6 months, employed in a managerial position by any other franchisee of PHI. This restriction will not be violated if, at the time PHI or Franchisee employs the individual, the current or former employer has given its written consent. If the restrictions contained in this Section 13 are violated, the amount of actual damages will be difficult to determine; therefore, the former employer will be entitled to liquidated damages in an amount equal to twice the total annual compensation of the employee involved (annualized, if appropriate, to reflect the rate of compensation for a full year's employment), plus reimbursement of all costs and attorneys' fees incurred. For purposes of this Section 13, "managerial position" means all employees at the pay grade of restaurant manager and above.

## 14. TRANSFERS

**14.1** **Transfers by PHI.** PHI may Transfer its rights and obligations under this Agreement without the consent of, or notice to, Franchisee. This Agreement will inure to the benefit of, and be binding upon, the successors and assigns of PHI.

**14.2** **Transfers by Franchisee.** Except as otherwise permitted by this Section 14 and Section 15, neither Franchisee nor any Person with an interest in Franchisee may, without PHI's prior written consent, directly or indirectly Transfer any Interest in this Agreement or any Interest in Franchisee. Any purported Transfer without PHI's prior, written consent will have no effect, except to cause a default under this Agreement.

**14.3** **Transfer of Assets.** Franchisee may not, without PHI's prior, written consent, Transfer or offer to Transfer any assets that bear any of the Pizza Hut Marks, except (a) to PHI or a subsidiary or franchisee of PHI, or (b) to an established salvage dealer, who destroys or disables the assets transferred under Franchisee's direct supervision.

In addition, Franchisee may not, without PHI's prior, written consent, offer to Transfer by public or private auction, or advertise publicly for Transfer, any of the furnishings, interior and exterior decor items, supplies, inventory, fixtures, equipment, smallwares, or other personal property used in connection with Franchisee's System Restaurants.

14.4 <u>Consent to Transfers</u>. PHI may withhold its consent to any proposed Transfer unless, in addition to the other requirements of this, Section 14 and the requirements of Section 15, the following conditions are met, to PHI's satisfaction, before the effective date of the proposed Transfer:

A. <u>No Default</u>. Franchisee is not in default under this Agreement or any other agreement with PHI, and Franchisee and its Related Persons have satisfied all accrued monetary and other obligations to PHI and its Affiliates.

B. <u>Release</u>. Franchisee and the transferor have each executed a general release, in a form prescribed by PHI, of all accrued claims against PHI, its Affiliates, and their respective officers, directors, and employees.

C. <u>Transfer Standards</u>. The proposed transferee has demonstrated to PHI's satisfaction that the proposed transferee is, in all respects, acceptable to PHI (including, if the proposed transferee is already a franchisee of PHI, that it is in Good Standing under its franchise agreements with PHI), and that the proposed transferee meets all of PHI's then current requirements for new franchisees (or for holders of an interest in a franchisee, as the case may be) including possession of good moral character and reputation, work experience, aptitude, financial background and condition, credit rating, absence of conflicting interests, and ability to comply fully with the terms of this Agreement.

D. <u>Assumption of Obligations</u>. The proposed transferee has entered into a written assumption agreement, in a form prescribed by PHI, assuming and agreeing to discharge all of transferor's obligations relating to this Agreement and to the System Restaurants covered by this Agreement (including all obligations owing to third parties not related to PHI).

E. <u>Training</u>. If not previously trained, the proposed transferee, its manager, and its other employees responsible for the operation of all System Restaurants, have satisfactorily completed the training PHI then requires under Section 4.1.

F. <u>Transfer Fee</u>. The transfer fee required by Section 9.3 has been paid.

G. <u>Acknowledgment</u>. If Franchisee or any owner of an Interest in Franchisee is transferring all of its Interest in this Agreement or in Franchisee, the proposed transferor has signed an acknowledgment that the covenants contained in Section 12 will continue to apply to the proposed transferor after the Transfer.

14.5 <u>Death or Incapacity</u>. Upon the death or permanent incapacity of Franchisee or any individual with an Interest in Franchisee, the executor, administrator, or personal representative of the affected individual will Transfer all of the individual's Interest to a third party approved by PHI within 6 months. All Transfers pursuant to this Section 14.5, including Transfers by devise or inheritance, will be subject to the same conditions as any other Transfer (including the conditions set forth in Sections 14.4 and 14.6). Nevertheless, in the case of a Transfer by devise or inheritance, if the heirs or devisees of the deceased are unable to meet the conditions in Section 14.4, the personal representative of the deceased will have a reasonable time (not more than 12 months after the date of death) to dispose of the decedent's Interest in this Agreement or in Franchisee, subject to all applicable terms and conditions for Transfers

App. 031

contained in this Agreement. In the case of permanent incapacity of an individual owner of an Interest in Franchisee or in this Agreement, the incapacitated individual may, with PHI's written consent, retain a non-controlling ownership Interest in Franchisee.

14.6    Right of First Refusal.    If Franchisee or any owner of an Interest in Franchisee receives and desires to accept any bona fide offer to Transfer all or any part of his, her, or its Interest in this Agreement or in Franchisee, and the intended Transfer is not a gift to a spouse or a direct descendant, and if the Transfer of such Interest would either (1) result in a change in control of the Franchisee, or (2) constitute a Transfer of any Interest by a Person holding a 10% or greater Interest in Franchisee, Franchisee or the proposed transferor will submit to PHI an executed copy of the agreement for Transfer (which will be conditioned on this right of first refusal). PHI may, within 30 days after receipt of a signed copy of the agreement and all necessary supporting documentation (including financial statements), send written notice to the transferor that PHI (or a Person designated by PHI) intends to purchase the Interest which is proposed to be Transferred on the same terms and conditions (or, at PHI's election, the reasonable cash equivalent, not including the value of any tax benefits, of any non-cash consideration) offered by the third party. Any material change in the terms of an agreement before closing will constitute a new agreement, subject to the same right of first refusal by PHI (or its designee) as in the case of the initial agreement. PHI's failure to exercise its right of first refusal will not constitute a waiver of any other provision of this Agreement, including any of the requirements of this Section 14 with respect to approval of the proposed transferee.

14.7    Other Permitted Assignments.    PHI's "Right of First Refusal Guidelines (July 21, 1986)," "Policy on Transfers to Trusts (June 1990, Revised August 1993)" and "Right of First Refusal Guidelines (November 9, 1992)" (collectively, the "Transfer Modifications"), which have been identified by PHI and IPHFHA, are hereby incorporated herein by reference. The provisions of the Transfer Modifications shall be deemed contractual provisions of this Agreement and not policies. The Transfer Modifications may be amended or modified from time to time by PHI and IPHFHA, and any such amendments or modifications shall automatically be incorporated herein. To the extent that the provisions of the Transfer Modifications are in direct conflict with the other provisions of Section 14 hereof, the provisions of the Transfer Modifications shall control.

## 15. NON-INDIVIDUAL FRANCHISEES

If Franchisee, any owner of an Interest in Franchisee, or any successor thereof, is not an individual, then each of the following provisions will apply:

15.1    List of Individual Owners.    Upon execution of this Agreement, upon each Transfer of an Interest in Franchisee, and at any other time upon PHI's request, Franchisee will furnish PHI a list of all Persons having an Interest in Franchisee, an indication of the voting rights and percentage Interest of each of those Persons, and a list of all officers, directors and similar officials of Franchisee, in the form of Appendix D. PHI may require the same information regarding all Persons having an Interest in Franchisee.

15.2    Personal Guaranties.    Upon the execution of this Agreement, upon each Transfer of an Interest in Franchisee, and at any other time upon PHI's request, all holders of a 10% or

-24-

greater Interest in Franchisee will execute a written agreement in the form of Appendix E, personally guaranteeing, jointly and severally with all other holders of a 10% or greater Interest in Franchisee, the full payment and performance of Franchisee's obligations to PHI and PHI's Affiliates. On the same occasions, all officers, directors and similar officials of Franchisee, and all holders of an Interest in Franchisee, will sign an agreement in the form of Appendix F, undertaking to be bound by all the terms of this Agreement, including the restrictions on Transfers and the covenants of confidentiality and against competition. None of these guaranties or agreements will be released by a Transfer of an Interest in Franchisee; all guaranties and undertakings may be released only by a written release signed by PHI.

15.3    Organizational Documents.  All of Franchisee's organizational documents (including articles of partnership, partnership agreements, articles of incorporation, bylaws, shareholders agreements, and trust instruments) will recite that the issuance and Transfer of any Interest in Franchisee is restricted by the terms of this Agreement, and that the sole purpose for which Franchisee is formed (and the sole activity in which Franchisee is or will be engaged) is the conduct of a retail food business pursuant to one or more franchise agreements from PHI. Franchisee will submit to PHI, upon the execution of this Agreement, a resolution of Franchisee (or its governing body) in the form of Appendix G.

15.4    Transfer Restrictions.  Franchisee will maintain stop transfer instructions against the Transfer on its records of any securities or other ownership Interests, and will not issue securities or other evidences of ownership without the following legend printed legibly and conspicuously on the face of the security or other evidence of ownership:

> The transfer of this certificate and the interests it represents are subject to the terms and conditions of one or more Franchise Agreements with Pizza Hut, Inc.; and to the restrictive provisions of the organizational documents of the issuer. Please refer to those documents for the terms of the restrictions.

15.5    Permitted Assignments.  Franchisee may assign not more than an aggregate total of 20% of the Interests in Franchisee to employees of Franchisee who are actively engaged in the operation of Franchisee's business under this Agreement, as long as the proposed transferee submits to PHI a franchise application in the form prescribed by PHI from time to time. Transfers under this provision may be made without complying with the other terms of this Section 15. Once created, those ownership Interests will be subject to all terms and conditions of this Agreement, including the restrictions on Transfers, the requirements of shareholder guaranties and agreements, and the covenants of confidentiality and against competition.

15.6    No Publicly Traded Ownership Interests.  Franchisee and its Related Persons may not offer, solicit, engage in, or effect any transaction, whether financial or otherwise, that could foreseeably result, directly or indirectly, in "public trading" or "public ownership" (as those terms are commonly understood for purposes of federal and state securities laws) of any securities or other Interests in (a) Franchisee, (b) any parent company of Franchisee, (c) this Agreement, or (d) the System Restaurants operated by Franchisee or any assets used by Franchisee in connection with those System Restaurants.

**15.7**  Changes in Ownership or Organization. Franchisee and its Related Persons will not reorganize or otherwise change the ownership or organizational structure of Franchisee or its Related Persons in any manner that is inconsistent with the provisions of Sections 14 and 15.

## 16. INSURANCE AND INDEMNIFICATION

**16.1**  Property Insurance. Franchisee will obtain and maintain throughout the Term, at its own expense, property insurance on an all-risk basis including flood coverage up to the limits available in the National Flood Insurance program, from financially-responsible insurance companies, insuring Franchisee's System Restaurants and their respective contents (whether those System Restaurants are completed or under construction) for the full replacement value of the System Restaurants. In the event of damage covered by insurance, the proceeds of the insurance will be used to restore the System Restaurants to their original condition within 120 days, unless restoration is prohibited by the appropriate lease or applicable law, or PHI has otherwise consented in writing.

**16.2**  Liability Insurance. Franchisee will obtain and maintain throughout the Term, at its own expense, with a financially-responsible insurance company, comprehensive general liability insurance (including products liability and completed operations coverage), comprehensive automobile liability insurance (including coverage for all owned, non-owned, leased, or hired vehicles); and liquor liability (dram shop) insurance, all in amounts at least equal to $3,000,000 combined single limit for death, personal injury, and property damage, as well as workers' compensation insurance (coverage B). All liability insurance maintained by Franchisee will designate PHI as an additional insured, as its interests may appear, and will insure against PHI's vicarious liability for actual and (unless prohibited by applicable law) punitive damages assessed against Franchisee.

**16.3**  Proof of Insurance. Franchisee will file with PHI certificates of insurance showing all coverages required by this Section 16, and will promptly pay all premiums on the policies as and when those premiums become due. In addition, all policies will contain a provision requiring 30 days' prior, written notice to PHI, by certified or registered mail, of any proposed cancellation or modification of the policies. If Franchisee fails to obtain or maintain the insurance required by this Section 16, PHI may, in addition to any other rights it may have, procure insurance for Franchisee without notice, and Franchisee will pay the premiums for, and PHI's cost of acquiring, that insurance immediately upon demand for those amounts.

**16.4**  Indemnification and Waiver. Franchisee will indemnify PHI, its Affiliates, and their respective employees, officers, and directors against all loss, damage, or liability (including attorneys' fees and costs) incurred by any of them owing to claims that arise directly or indirectly from or in connection with Franchisee's operations under this Agreement. If Franchisee fails to maintain the insurance required by this Section 16, or fails to name PHI as an additional insured under that policy, then Franchisee's obligations of indemnity under this Section 16.4 will also extend to all liability that would have been insured by an appropriate policy (including liability arising from PHI's own negligence). The insufficiency of the insurance required to be maintained by Franchisee under the terms of this Section 16 will not be a defense to liability under this Section 16.4.

Franchisee waives all claims it may have against PHI, its Affiliates, and their respective officers, directors, and employees (including claims arising from training, establishment of procedures, and food and other products distributed but not manufactured by PHI or its Affiliates), except for claims arising from those parties' intentional misconduct or gross negligence.

## 17. REQUESTS FOR WAIVERS AND CONSENTS

17.1    Requests for Waivers or Consents.  Whenever Franchisee desires PHI's waiver of any obligation in this Agreement, and whenever this Agreement requires Franchisee to obtain PHI's prior, written consent, Franchisee will address its written request for the waiver or consent to PHI's Vice President-Franchising (unless PHI specifies another individual or department in writing). The request will specify the provision of this Agreement for which a waiver or consent is sought, and will set forth the basis for the request. PHI's failure to advise Franchisee within 45 days after receipt of the request that a request is denied constitutes PHI's consent to the request (except that, if PHI gives Franchisee written notice within the 45-day period that PHI requires additional information or documentation from Franchisee, the 45 days will not begin until Franchisee has provided PHI with all relevant information and documentation requested).

17.2    Effect of Waivers and Consents.  All requests for waivers and consents will be considered on a case-by-case basis, and nothing requires PHI to grant any waiver or consent. PHI may condition the grant of a waiver or consent as PHI considers appropriate.

17.3    No Implied Waivers.  Except as provided in Section 17.1, no other action or inaction by PHI will constitute a waiver, or impair any right, power, or option reserved to PHI by this Agreement. No waivers can be inferred from PHI's failure to respond to a situation with respect to which Franchisee has not requested a waiver in accordance with Section 17.1.

## 18. DEFAULT AND TERMINATION

18.1    Defaults Without Cure Right.  Franchisee will be in default and, in addition to all other remedies PHI has at law or in equity, including money damages, injunctive relief, and attorney's fees, PHI may, upon written notice to Franchisee, terminate this Agreement without affording Franchisee any opportunity to cure the default upon the occurrence of any of the following events or conditions:

    A.    Financial Performance.  If the total of Franchisee's debts is greater than the fair value of Franchisee's assets, or if Franchisee is generally not paying its debts as those debts, become due, or if Franchisee admits in writing its inability to pay its debts, or if Franchisee makes a general assignment for the benefit of its creditors, or if Franchisee ceases doing business as a going concern, or if Franchisee files a petition commencing a voluntary case under any chapter of the Bankruptcy Code (11 U.S.C. §101, et seq.), as amended.

    B.    Improper Transfer.  If, without the prior, written consent of PHI, or in any other manner inconsistent with the terms of this Agreement, (i) Franchisee Transfers or attempts to Transfer an Interest in this Agreement, (ii) any owner of an Interest in Franchisee Transfers or attempts to Transfer any portion of that Interest, (iii) Franchisee or any of its Related Persons violates Section 15.6, or (iv) Franchisee dissolves or liquidates.

-27-

C.      **Failure to Allow Inspection**.   If Franchisee does not allow PHI or its employees or agents access to any System Restaurant or to any of Franchisee's records, or if Franchisee otherwise impairs PHI's rights of inspection and audit under this Agreement.

D.      **Criminal Conviction**.  If Franchisee (or any of its Related Persons actively involved in the operation, supervision, or management of any System Restaurant) is convicted of a felony or other crime involving moral turpitude.

E.      **Disclosure of Secrets**.  If Franchisee or any of its Related Persons discloses, permits the disclosure of, or uses, the contents of the Manuals or any other trade secrets or confidential or proprietary information provided to Franchisee by PHI, contrary to the provisions of this Agreement or otherwise to the detriment of PHI.

F.      **Falsification of Records**.  If Franchisee knowingly or through gross negligence maintains false books or records, or knowingly or through gross negligence submits any false report to PHI.

G.      **Habitual Default**.  If Franchisee defaults under Section 18.2 on 3 or more occasions in any 12-month period, or on 5 or more occasions in any 36-month period, even if Franchisee would otherwise be given an opportunity under Section 18.2 to cure the particular default involved.

H.      **Endangerment**.   If Franchisee conducts the business licensed by this Agreement so contrary to this Agreement and the Manual as to constitute an imminent danger to the public health.

I.      **Material Misrepresentation**.  If Franchisee (or any Person having a 10% or greater Interest in Franchisee) made a material misrepresentation about any material fact in a franchise application given to PHI.

J.      **Unauthorized Closure or Loss of Occupancy Right**.   If any System Restaurant is closed for business for more than 15 consecutive days, for reasons other than a casualty loss, without PHI's prior written consent, or Franchisee permanently loses its right to occupy a Location.

18.2    **Defaults Subject to Cure Rights**.  Franchisee will be in default and, in addition to all other remedies PHI has at law or in equity, including damages, injunctive relief, and attorney's fees, PHI may, subject to the notice and cure provisions described below, terminate this Agreement if:  1) Franchisee does not promptly pay when due any moneys owing to PHI or its Affiliates, or 2) Franchisee breaches any term, covenant, duty, or condition of this Agreement not listed in Section 18.1.

PHI will not terminate this Agreement for any default under this Section 18.2 until PHI first gives Franchisee written notice of, and an opportunity to cure, the default. Except as provided below, PHI will give Franchisee 30 days after the effective date of notice to cure any such default. If Franchisee's current default involves a failure to timely pay amounts owing PHI or its Affiliates, and if Franchisee has previously been in default for failure to timely pay under this Agreement in the 12 months immediately before the date on which PHI gives Franchisee

-28-

App. 036

notice of Franchisee's current default, PHI will only be required to give Franchisee 10 days to cure Franchisee's current default.

18.3    Non-Termination Remedies.  If Franchisee defaults under Section 18.1, or does not timely cure a default under Section 18.2, PHI may, in its sole discretion, and in lieu of terminating this Agreement, refuse to allow Franchisee to relocate any existing System Restaurants or to develop any additional System Restaurants. PHI will give Franchisee written notice if PHI elects this option. Any action taken by PHI in accordance with this Section will be in addition to any other right or remedy PHI may have, including a civil action for legal or equitable relief.

## 19.  POST-TERMINATION PROVISIONS

19.1    Use of Pizza Hut Marks and Systems.   Upon expiration or termination of this Agreement, Franchisee will immediately discontinue use of the Pizza Hut Marks and of the System Restaurant Concepts. In addition, upon notice from PHI, Franchisee will immediately discontinue use of PHI's color scheme (by repainting, if necessary) and will immediately remove all identifying architectural superstructure (as set forth in the plans and specifications) and other distinguishing structures, decor items, furniture, and equipment from all former System Restaurants and other facilities as PHI may direct, in order to effectively distinguish Franchisee's former System Restaurants and other facilities from PHI's proprietary design(s) and trade dress. If Franchisee does not make all required changes within 7 days after written notice, then PHI, in addition to any other remedy it has, may enter upon the premises of any former System Restaurant owned or leased by Franchisee, and make or cause to be made all necessary changes at the expense of Franchisee (without being liable for trespass or any other tort), which expense Franchisee will pay upon demand.

19.2    Cessation of Rights.  All obligations of PHI to Franchisee under this Agreement, and all rights of Franchisee under this Agreement, will immediately terminate upon termination of this Agreement.

19.3    Effect on Other Duties.  In no event will a termination of this Agreement affect the obligations of Franchisee and its Related Persons to pay their accrued monetary obligations to PHI and to comply with their various post-term obligations, including the covenants in Section 12.

19.4    Trademarked Items.  PHI may, by written notice within 30 days after expiration or other termination of this Agreement, purchase from Franchisee all items bearing any of the Pizza Hut Marks. If PHI exercises this option, the purchase price for the items will be the lowest of the fair market value of the items, Franchisee's purchase price for the items, or Franchisee's book value for the items.

19.5    Telephone Numbers.  PHI may, upon written notice within 30 days after expiration or other termination of this Agreement, take an assignment of all telephone numbers (and associated listings) for Franchisee's System Restaurants and centralized order-taking facilities (if any).

-29-

App. 037

## 20. DISPUTE RESOLUTION

20.1    Jurisdiction and Governing Law.    This Agreement takes effect upon its acceptance and execution by PHI. This Agreement is governed by, and should be construed in accordance with, the internal laws of the State of Texas (without giving effect to Texas choice of law rules). Franchisee acknowledges the importance to the System Restaurant Concepts of uniformity of interpretation, and therefore consents and waives any objections Franchisee might otherwise have to the jurisdiction and venue of any state or federal court of general jurisdiction in Dallas County, Texas, or any other county or district in which PHI then has its principal place of business, with respect to any proceedings arising out of this Agreement or the relationship between the parties. Franchisee further agrees that it will bring any legal proceedings arising out of this Agreement or the relationship between the parties only in such courts. Franchisee agrees that mailing of any process to Franchisee's appropriate address pursuant to Section 21.5, by registered or certified mail or reputable private delivery service, will constitute lawful and valid process.

20.2    Remedies Cumulative.    All remedies provided in this Agreement are cumulative and non-exclusive. PHI may simultaneously seek relief specifically provided for by this Agreement and relief not so provided, and may also seek two or more forms of relief otherwise inconsistent, and that could not be granted simultaneously. A request by PHI for interim damages for a particular violation will not constitute an admission that the continuation of the violation would not cause irreparable harm to PHI.

20.3    Mediation.    All disputes between PHI and Franchisee relating to this Agreement will be submitted to mediation under the National Franchise Mediation Program administered CPR (or, if that program is discontinued, any successor program or the nearest available substitute). This Section 20.3 applies only to disputes that are specific to Franchisee and not to issues that affect PHI's franchisees generally.

20.4    Injunctive Relief.    In case of a breach or a threatened breach of any provision of this Agreement by Franchisee, PHI will, in addition to any other remedy it has, and notwithstanding any other provision of this Agreement (including Section 20.3), be entitled to an injunction restraining Franchisee from committing or continuing to commit any breach or threatened breach of this Agreement, without showing or proving any actual damage sustained by PHI, and without posting bond or other security. No action for a preliminary or temporary injunction by PHI may be stayed pending mediation, but once a temporary injunction (pending outcome of the dispute) is granted, the issues underlying the dispute will be submitted to mediation in accordance with Section 20.3.

20.5    Attorneys' Fees.    If PHI and Franchisee become involved in litigation, the losing party will reimburse the prevailing party's outside attorneys' fees and all expenses. This provision will not apply to attorneys' fees incurred by the parties in connection with mediation conducted pursuant to Section 20.3.

## 21. MISCELLANEOUS

21.1    Relation of Parties.  PHI and Franchisee are not and will not be considered as joint venturers, partners, or agents of each other. Neither Franchisee nor PHI will have the power to bind or obligate the other except as set forth in this Agreement.

Franchisee specifically acknowledges that the relationship created by this Agreement is not a fiduciary, special, or any other similar relationship, but rather is an arm's-length business relationship.

PHI owes Franchisee no duties except as expressly provided in this Agreement.

21.2    Counterparts.  This Agreement may be executed in any number of counterparts, each of which, when executed and delivered, will be deemed an original, but all counterparts together will constitute but one and the same instrument.

21.3    Third-Party Beneficiaries.    The other franchisees of PHI are intended beneficiaries of Section 13 of this Agreement; the Affiliates of PHI, and the employees, officers, and directors of PHI and its Affiliates are intended third-party beneficiaries of Section 16.4 of this Agreement. Nothing else in this Agreement is intended to confer any rights or remedies upon any Person or legal entity not a party to this Agreement.

21.4    Severability.  The portions of this Agreement relating to the payment of fees to PHI, and the portions relating to the protection and preservation of the Pizza Hut Marks, the System Restaurant Concepts, and PHI's trade secrets are critical to this Agreement; if any portion of them is declared invalid or unenforceable for any reason, PHI will have the option to terminate this Agreement immediately, upon written notice to Franchisee. All other terms and conditions of this Agreement, and every portion of those other terms and conditions, will be considered severable. If, for any reason, any portion of this Agreement (other than the nonseverable portions, as defined in the first sentence of this Section 21.4) is determined to be invalid or contrary to or in conflict with any applicable present or future law, rule, or regulation, in a final, unappealable ruling issued by any court, agency, or tribunal with valid jurisdiction in a proceeding to which PHI is a party, that ruling will not impair the operation of, or have any other effect upon, any other portion of this Agreement, each of which will remain binding upon the parties and continue to be given full force and effect. Any invalid portion will be deemed removed from this Agreement as of the date upon which the ruling becomes final (if Franchisee is a party to such proceedings) or upon Franchisee's receipt of notice of non-enforcement from PHI, and will further be deemed replaced by the closest enforceable provision.

21.5    Protests, Requests and Notices.  All protests, requests and notices required or permitted by the terms of this Agreement will be in writing and sent either by certified or registered mail (return receipt requested), by reputable private delivery service, or by hand delivery. All notices will be sent to the respective address of PHI (marked, except as otherwise required by this Agreement, "Attention: Vice President-Franchising") or Franchisee shown on page 1 of this Agreement, until PHI or Franchisee (as the case may be) gives notice, in writing, of a new address. Neither PHI nor Franchisee must send multiple notices; a single notice to the specified address will suffice, and if multiple addresses are specified by either party, the sending

-31-

party may send notices to any single address chosen in good faith. Notices will be effective on the day delivery is made or first attempted at the specified address during normal business hours (8 a.m. to 5 p.m., Monday through Friday, except national or state holidays), except that notices of change of address will be effective 10 days after that date.

21.6    <u>Time of Essence</u>.  Time is of the essence of this Agreement and of each provision of this Agreement.

21.7    <u>Rules of Construction</u>.  The following rules were used in drafting this Agreement, and should be used in construing it:

A.    <u>Auxiliary Verbs</u>.  The auxiliary verb "will" is used in a mandatory fashion. Any time this Agreement provides that a party will do something, the statement is obligatory, and is intended to apply throughout the life of this Agreement. By contrast, the auxiliary verb "may" is permissive when stated affirmatively ("a party may do something" means that the party is permitted, but not required, to take the action), and by extension, prohibitive when stated negatively (that is, the statement that "a party may not do something" is a denial of permission, and therefore means not only that the action is not required, but also that it is not permitted).

B.    <u>Includes</u>.  The word "includes" (in all its tenses and variations) is always used in the non-exclusive sense. As a result, the words "including" or "includes" can always be read as if followed by the phrase, "but [is] not limited to" or the phrase, "without limitation".

C.    <u>Accounting Periods</u>.  Any time that this Agreement calls for a party to take an action "monthly", the party may instead use regular accounting periods that are no longer than 35 days long. For example, a party may use 13 accounting periods of 4 weeks each (a "52/53 week fiscal year") or may use 12 accounting periods arranged so that there are two 4-week and one 5-week accounting period each fiscal quarter. PHI currently uses a 52/53 week fiscal year, divided into 13 4-week periods, ending on the Wednesday before the last Saturday in December of each year. PHI may change its accounting cycle on 30 days' written notice to Franchisee. If Franchisee chooses to use one of these methods of accounting, Franchisee will notify PHI of the method chosen and the fiscal year-end used, and may not switch accounting years without consent from PHI.

D.    <u>Locations, Boundaries and Measurements</u>.  The sites of the Locations and the boundaries of the Delivery Area are based on the physical location of the references used to describe the Locations or the boundaries on the date of this Agreement. If a street address is used to describe a Location, the renumbering of the addresses will not serve to move the Location. If a specified boundary of the Delivery Area is described as a street, the center line of the street is intended; if the boundary is described as a political dividing line (such as a city limit), the line utilized by the appropriate political jurisdiction is intended. The area and physical location of any Location or of the Delivery Area will not be altered by a subsequent movement of the references originally used to describe the Location or the Delivery Area. Furthermore, it is only those points to the "inside" of the boundary that form a part of the Delivery Area (for example, if a Delivery Area is bounded on the north by Main Street, only the area south of the center line of Main Street is within the Delivery Area).

-32-

Location Franchise Agreement

For all calculations based upon a distance, the measurement will be made in a straight line between the nearest points; if any portion of an object is within the prescribed distance from a point, the entire object is considered to be within that distance.

21.8    Merger. Effective January 1, 2003, the Old Franchise Agreement shall be merged into this Agreement, and, except for the side agreements listed on Appendix J, the Old Franchise Agreement and any amendments thereto previously executed by Franchisee with respect to the Location(s) franchised under this Agreement shall be of no further force or effect whatsoever. The foregoing shall not release Franchisee or PHI from the following: (i) any liability for monetary obligations existing prior to January 1, 2003, including obligations arising pursuant to Sections 7 or 9 of the Old Franchise Agreement, or (ii) indemnification liability under Section 16.4 of the Old Franchise Agreement based upon facts or circumstances existing prior to January 1, 2003.

PHI and Franchisee may have entered into certain amendments, supplements or side agreements relating to the Old Franchise Agreement (collectively, the "Side Agreements"). PHI and Franchisee intend that certain or all of the Side Agreements shall continue in full force and effect after the execution and delivery of this Agreement. To the extent that the provisions of the Side Agreements are in direct conflict with the provisions of this Agreement, the provisions of the Side Agreements shall control. All of the Side Agreements which PHI and Franchisee intend to remain in full force and effect are identified on Schedule J.

Except as provided above, except as provided in the Side Letters listed on Schedule J hereto, and except as provided in the Advertising Committee Agreement, all prior discussions or negotiations (written or oral), including those included in PHI's offering circular, are merged into this Agreement, and no representations, inducements, promises, or agreements not embodied in this Agreement will survive the execution of this Agreement. This Agreement may not be modified or amended except (i) pursuant to Section 17; (ii) by a modification, supplement, or revision to the Manual issued by PHI in accordance with the terms of this Agreement, or (iii) by a written document, signed by both parties, specifically referring to the portion of this Agreement being modified or amended.

WITNESS:                                PIZZA HUT, INC.
                                        "PHI"

By: _____
                                        , Vice President

WITNESS:

                                        "FRANCHISEE"

                                        By: _____

                                        its Manager and Sole Member
                                        By: _____ President

# APPENDIX A

## PARTIAL LIST OF "PIZZA HUT" MARKS

| Mark | Registration Number | Registration Date |
|---|---|---|
| PIZZA HUT | 729,847 | 04/10162 |
| PIZZA HUT | 1,043,014 | 07/06/76 |
| PIZZA HUT | 1,069,731 | 07/19/77 |
| PIZZA HUT | 926,516 | 01/04/72 |
| PIZZA HUT Logo (service mark) | 1,028,170 | 10/23/75 |
| PIZZA HUT Logo (trademark) | 1,061,317 | 03/15/77 |
| PIZZA HUT Logo (trademark) | 1,089,680 | 04/19/78 |
| THICK 'N CHEWY | 1,096,909 | 07/18/78 |
| THIN 'N CRISPY | 1,096,198 | 07/11/78 |
| Building Design No. 1 | 852,458 | 07/09/68 |
| Building Design No.2 | 1,068,095 | 06/21/76 |
| PIZZA HUT within Sign Design | 1,079,511 | 12/13/77 |
| Roof Design (trademark) | 1,116,486 | 04/10/79 |
| BIG TOPPER (trademark) | 1,374,944 | 12/10/85 |
| PERSONAL PAN PIZZA (trademark) | 1,400,567 | 07/08/86 |
| BOOK IT! (service mark) | 1,430,605 | 02/24/87 |
| PIZZA HUT (trademark) lined for color red | 1,443,457 | 06/16/87 |
| PIZZA HUT DELIVERY Design (trademark) | 1,445,612 | 06/13/87 |
| PIZZA HUT Delivery - Truck Design | 1,474,524 | 01/26/88 |
| MAKIN' IT GREAT! (service mark) | 1,505,367 | 09/20/88 |
| BOOK IT! and design | 1,561,899 | 10/24/89 |
| PIZZA HUT Logo (with phone design) | 1,661,222 | 10/15/91 |
| MAKIN' IT GREAT FOR KIDS! | 1,693,612 | 06/09/91 |
| PERSONAL PAN PIZZA EXPRESS AND DESIGN | 1,772,099 | 05/15/93 |

6/22/09:

→ 5051 South 76 St. Greenville —
as known as Milwaukee.
→ 4153 South 76 St. Greenville —
also known as 4171 South
76 St. Greenville.
→ Change address from
16720 to 16730 W. Janesville
Rd. Muskego, WI
→ Change address from
324 to 334 East Capitol,
Space 6 Milwaukee
→ Change address from
2300 to 2340 North
Farwell Ave Milwaukee
→ Change address from
7255 S. 76th Ave to

7251 South 76 St. Franklin

→ Change address from

128 to 130 North Grand

Avenue Waukesha

## APPENDIX B

LOCATIONS:

| | | | |
|---|---|---|---|
| 1610 West Washington Street | West Bend | WI | 53095 |
| 5000 Washington Avenue | Racine | WI | 53403 |
| 1107 North 14th | Sheboygan | WI | 53081 |
| 1955 Wisconsin Avenue | Grafton | WI | 53024 |
| 4153 South 76th Street | Greenfield | WI | 53220 |
| 5051 South 27th Street | Greenfield | WI | 53221 |
| W156-N8420 Pilgrim Road | Menomonee Falls | WI | 53051 |
| 910 Summit Avenue | Oconomowoc | WI | 53066 |
| 1021 North Wisconsin Street | Port Washington | WI | 53074 |
| 940 Milwaukee Avenue | Burlington | WI | 53105 |
| 105 Freistadt Road | Thiensville | WI | 53092 |
| 239 Main Street | Thiensville | WI | 53092 |
| 447 West Sunset Drive | Waukesha | WI | 53186 |
| 2021 South Springdale Road | Waukesha | WI | 53186 |
| 10870 West Bluemound Road | Wauwatosa | WI | 53213 |
| 6040 North Port Washington Road | Glendale | WI | 53209 |
| 1214 Utah Street | Watertown | WI | 53094 |
| 1107 West Main Street | Whitewater | WI | 53190 |
| 840 A Park Avenue | Beaver Dam | WI | 53916 |
| 7 Madison Avenue | Fort Atkinson | WI | 53538 |
| 801 William Street | Lake Geneva | WI | 53147 |
| 3905 52nd Street | Kenosha | WI | 53140 |
| 16720 W. Janesville Road | Muskego | WI | 53150 |
| 1261 East Geneva Street | Delavan | WI | 53115 |
| 1505 Eastern Avenue | Plymouth | WI | 53073 |
| 2727 South Business Drive | Sheboygan | WI | 53081 |
| 678 Grand Avenue | Hartford | WI | 53027 |
| 1708 Summit Avenue | Waukesha | WI | 53186 |
| 3800 North 124th Street | Wauwatosa | WI | 53213 |
| 124 North Chicago Avenue | South Milwaukee | WI | 53172 |
| 955 S. Main, Unit B | Mukwonago | WI | 53149 |
| 4608 75th Street | Kenosha | WI | 53140 |
| 6805 West Brown Deer | Milwaukee | WI | 53223 |
| 383 West Brown Deer Road | Fox Point | WI | 53217 |
| 11133 West Silver Spring | Milwaukee | WI | 53225 |
| 324 East Capitol, Space 6 | Milwaukee | WI | 53212 |
| 7604 Burleigh | Milwaukee | WI | 53210 |
| 2300 North Farwell Avenue | Milwaukee | WI | 53211 |
| 17800 West Bluemound Road | Brookfield | WI | 53005 |
| 517 Glenview | Wauwatosa | WI | 53213 |
| 12426 West National | New Berlin | WI | 53151 |
| 1840 South 15th Street | Milwaukee | WI | 53204 |

B-1

| | | | |
|---|---|---|---|
| 3131 South Kinnickinnic | Milwaukee | WI | 53207 |
| 843 West Layton Avenue | Milwaukee | WI | 53221 |
| 6728 Greenfield Avenue | West Allis | WI | 53214 |
| 128 North Grand Avenue | Waukesha | WI | 53188 |
| 5821 West Silver Spring Drive | Milwaukee | WI | 53218 |
| 6926 West Capitol Drive | Milwaukee | WI | 53216 |
| 2401 Douglas Avenue | Racine | WI | 53402 |
| 3001 Roosevelt Road | Kenosha | WI | 53142 |
| 3322 West Loomis | Greenfield | WI | 53221 |
| 1350 West Captial Drive | Pewaukee | WI | |
| 7255 S. 76th Ave. | Franklin | WI | |

## DELIVERY AREA:

The following locations and the area within the boundaries of the trade areas defined on the maps attached hereto and made a part hereof:

| | | | |
|---|---|---|---|
| 1610 West Washington Street | West Bend | WI | 53095 |
| 5000 Washington Avenue | Racine | WI | 53403 |
| 1107 North 14th | Sheboygan | WI | 53081 |
| 1955 Wisconsin Avenue | Grafton | WI | 53024 |
| 4153 South 76th Street | Greenfield | WI | 53220 |
| W156-N8420 Pilgrim Road | Menomonee Falls | WI | 53051 |
| 910 Summit Avenue | Oconomowoc | WI | 53066 |
| 1021 North Wisconsin Street | Port Washington | WI | 53074 |
| 940 Milwaukee Avenue | Burlington | WI | 53105 |
| 6040 North Port Washington Road | Glendale | WI | 53217 |
| 1214 Utah Street | Watertown | WI | 53094 |
| 1107 West Main Street | Whitewater | WI | 53190 |
| 840 A Park Avenue | Beaver Dam | WI | 53916 |
| 7 Madison Avenue | Fort Atkinson | WI | 53538 |
| 3905 52nd Street | Kenosha | WI | 53140 |
| 16720 W. Janesville Road | Muskego | WI | 53150 |
| 2727 South Business Drive | Sheboygan | WI | 53081 |
| 678 Grand Avenue | Hartford | WI | 53027 |
| 1708 Summit Avenue | Waukesha | WI | 53186 |
| 3800 North 124th Street | Wauwatosa | WI | 53213 |
| 124 North Chicago Avenue | South Milwaukee | WI | 53172 |
| 955 S. Main, Unit B | Mukwonago | WI | 53149 |
| 6805 West Brown Deer | Milwaukee | WI | 53223 |
| 383 West Brown Deer Road | Fox Point | WI | 53217 |
| 11133 West Silver Spring | Milwaukee | WI | 53225 |
| 324 East Capitol, Space 6 | Milwaukee | WI | 53212 |
| 7604 Burleigh | Milwaukee | WI | 53210 |

B-2

Location Franchise Agreement

| | | | |
|---|---|---|---|
| 2300 North Farwell Avenue | Milwaukee | WI | 53211 |
| 17800 West Bluemound Road | Brookfield | WI | 53005 |
| 517 Glenview | Wauwatosa | WI | 53213 |
| 12426 West National | New Berlin | WI | 53151 |
| 1840 South 15th Street | Milwaukee | WI | 53204 |
| 3131 South Kinnickinnic | Milwaukee | WI | 53207 |
| 843 West Layton Avenue | Milwaukee | WI | 53221 |
| 6728 Greenfield Avenue | West Allis | WI | 53214 |
| 128 North Grand Avenue | Waukesha | WI | 53188 |
| 5821 West Silver Spring Drive | Milwaukee | WI | 53218 |
| 6926 West Capitol Drive | Milwaukee | WI | 53216 |
| 2401 Douglas Avenue | Racine | WI | 53402 |
| 3001 Roosevelt Road | Kenosha | WI | 53142 |
| 3322 West Loomis | Greenfield | WI | 53221 |
| 1350 West Captial Drive | Pewaukee | WI | |
| 7255 S. 76th Ave. | Franklin | WI | |

B-3

## APPENDIX C

Pizza Hut, Inc.
14841 N. Dallas Parkway
Dallas, TX 75240-2100

| | |
|---|---|
| SUBJECT: | LEASE AGREEMENT |
| DATED: | _____ |
| PREMISES LOCATION: | _____ |
| | _____ |
| LEASE COMMENCEMENT DATE: | _____ |

TO PIZZA HUT, INC.

The purpose of this letter is to confirm that the Lease described above, between _____
_____ as Lessor, and your
franchisee, _____ as Lessee contains the following
provision:

> Upon expiration or termination of this Lease, Lessee/Tenant may de-identify
> the leased premises. If Lessee/Tenant fails to do so, Pizza Hut, Inc., may de-
> identify. Deidentification consists of removal of all signs, modification or
> remodeling of all identifying architectural features (by, removing the cupola
> from the roof, replacing any trapezoidal windows with rectangular windows,
> and similar actions), repainting as necessary to no longer use the color scheme
> used by Pizza Hut, Inc., and any other steps necessary (in the sole discretion of
> Pizza Hut, Inc.) to effectively distinguish the formerly leased premises from
> Pizza Hut, Inc.'s proprietary building design(s). All deidentification will be
> done without cost to Lessor/Landlord.

As Lessor under the Lease Agreement, the undersigned agrees not to modify the provision
set forth above without the prior, written consent of Pizza Hut, Inc.

At any time upon 10 days written notice to Lessor, Pizza Hut, Inc. may receive a copy of the
Lease Agreement together with any amendments thereto.

_____

"LESSOR"

Lessor's Contact Information:

By:_____

Address:_____

_____

Phone:_____

C-1

Location Franchise Agreement

App. 048

## **APPENDIX D**

## **CERTIFICATE OF OWNERSHIP**

The undersigned, who is the authorized representative of ████████████ ("Franchisee"), hereby certifies to Pizza Hut, Inc., that the following information is true and correct and reflects all of the individuals who own (directly or indirectly) any interest in Franchisee:

| Name | Shareholder, Officer, Director, Member, Manager, and/or Partner | Percentage of Interest in Franchisee | Number of Class A voting shares in PH Hospitality Group, LLC | Number of Class B non-voting shares in PH Hospitality Group, LLC |
|---|---|---|---|---|
| PH Hospitality Group, LLC | Manager/Sole Member | 100% | | |
| Mark Dillon | President/Director/Member | | 212.48 | 0 |
| David Devorkin | Director/Member | | 287.47 | 0 |
| David Israel | Director/Member | | 3.75 | 0 |
| Query – PH Family Limited Partnership | Member | | 186.23 | 0 |
| Israel Family Limited Partnership | Member | | 371.21 | 0 |
| KiKoo, LLC | Member | | 33.747 | 0 |
| Paul Fransen | Member | | 33.747 | 0 |
| Jonathon Ellefson | Member | | 33.747 | 0 |
| 2F, LLC | Member | | 74.99 | 0 |
| PHGB Investment Company, LLC | Member | | 0 | 1049.82 |
| | | | 1237.37 | 1049.82 |

Dated as of the _____ day of _____, 2002.



"Franchisee"

By:_____

its Manager and Sole Member

By:

## **APPENDIX E**

## **PERSONAL GUARANTY**

PIZZA HUT, INC.
14841 N. Dallas Parkway
Dallas, TX 75240-2100

Re: Guaranty of Franchisee Obligations

Dear Franchisor:

To induce you to enter into the Location Franchise Agreement dated January 1, 2003 with ▮▮▮▮▮▮ as "Franchisee", or to induce you to approve a transfer of a direct or indirect interest in the Franchise Agreement or in Franchisee, we represent and agree as follows:

1.    We are all of the holders (directly or indirectly) of 10% or more of the record or beneficial ownership interests in Franchisee.

2.    We each personally guarantee, jointly and severally with each other, the complete performance of each of the terms and conditions of the Location Franchise Agreement to be performed by Franchisee, and jointly and severally agree to indemnify Pizza Hut, Inc., its "Affiliates" (as that term is defined in the Location Franchise Agreement), and the officers, directors, and employees of each of them from any liability or expense (including reasonable attorneys' fees) sustained by reason of the failure of Franchisee to perform and comply with the terms and conditions of the Location Franchise Agreement.

3.    We understand that disposition of our interest in Franchisee will not release our liability under this Guaranty, and that only a written release signed by Pizza Hut, Inc., will have that effect.

4.    We also understand that this is a continuing, absolute, and unconditional Guaranty, coextensive with the Location Franchise Agreement. We each expressly waive notice of acceptance of this Guaranty, notice of default by Franchisee, and notice of nonpayment or nonfulfillment of Franchisee's duties, liabilities, and obligations under the Location Franchise Agreement.

Very truly yours,



By: _____

E-1



By: ███          general partner

By: _____
      ███     President

By: ███

By: _____
      ███   President



By: ███████████ general partner

By: ███████████ President

By: ███████████ general partner

By: █████ President

Location Franchise Agreement



By: ███████ general partner

By: \
███████ President

By: ███████ general partner

By: \
███████ ent

David Devorkin

David Israel

## **APPENDIX F**

## **ASSUMPTION OF OBLIGATIONS**

PIZZA HUT, INC.
14841 N. Dallas Parkway
Dallas, TX 75240-2100

Re: Assumption of Obligations

Dear Franchisor:

To induce you to enter into the Location Franchise Agreement dated January 1, 2003, with ▉▉▉▉▉ as "Franchisee", or to induce you to approve a transfer of a direct or indirect interest in the Location Franchise Agreement or in Franchisee, we represent and agree as follows:

1. We are all of the officers and directors of Franchisee, and all of the holders (directly or indirectly) of any record or beneficial ownership interests whatsoever in Franchisee.

2. We each agree to be bound individually by all terms and obligations of the Location Franchise Agreement that are applicable to Franchisee's "Related Persons" (as that term is defined in the Location Franchise Agreement). Without trying to list those terms and obligations, we understand that they include restrictions on disposition of interests in Franchisee and covenants of confidentiality and against competition.

3. We understand that neither the expiration or termination of the Location Franchise Agreement, nor a disposition of our interests in Franchisee, will release our responsibility to comply with the terms and obligations of the Location Franchise Agreement that are applicable after expiration or termination, or after a disposition (as the case may be). We also understand that there are covenants of confidentiality and against competition in the Location Franchise Agreement that survive the expiration, termination, or disposition of our interests.

Very truly yours,



Location Franchise Agreement



By: ████████ Managing Member

By: ████████ general partner

By: ████████ President

By: ████████ general partner

By: ████████ President

By: ████████ Manager

By: ████████ Manager

F-2



Location Franchise Agreement

App. 056



By: _____
██████  Managing Member

By: ██████  general partner

By: _____
██████  President

By: ██████  general partner

By: ██████  President

By: _____
██████  Manager

By: _____
██████  Manager

F-2

Location Franchise Agreement



███████████████████████████ **LLC**

By: _____
                Managing Member

By: _____ general partner

By: _____
             President

By: _____ general partner

By: _____
         President

By: _____

By: _____



By: ███████████ Managing Member

By: █████ general partner

By: █████ President

By: ███████████████ general partner

By: █████ President

By: █████████ Manager

By: █████████ Manager

Location Franchise Agreement

App. 059

**APPENDIX G**
**CERTIFICATE OF CONSENT OF MANAGING MEMBER OF**

**a limited liability company**

The undersigned hereby certifies to Pizza Hut, Inc. ("PHI"), that it is the Managing Member of ███████, a Wisconsin limited liability company ("Franchisee"), and does hereby consent to and authorize the following actions of Franchisee:

WHEREAS, Franchisee has entered into a Location Franchise Agreement (the "Agreement") with PHI to operate Pizza Hut restaurants in the location(s) specified in Appendix B of the Agreement; and

WHEREAS, Sections 14 and 15 of the Agreement impose certain requirements upon Franchisee, restrict the issuance and transfer of any Interest in Franchisee, and require that Franchisee submit to PHI a resolution of Franchisee, ratified by all individuals who own an Interest in Franchisee, which states that without PHI's prior written consent, no Interests in Franchisee will be issued, transferred, or assigned to any person or entity.

NOW, THEREFORE, be it resolved (jointly by all individuals who own an Interest in Franchisee) that, except as permitted by Sections 14 and 15 of the Agreement, no Interests in Franchisee shall be issued, transferred, or assigned to any person or legal entity without PHI's written consent; and

FURTHER RESOLVED that the Secretary or a similarly charged officer of Franchisee shall maintain stop transfer instructions against the transfer of the company's records of any securities that do not comply with the restrictions of this resolution and Sections 14 and 15 of the Agreement; and

FURTHER RESOLVED that the Secretary or a similarly charged officer legibly and conspicuously print the following legend on all securities or other documents evidencing an ownership interest in Franchisee:

> The transfer of this certificate is subject to the terms and conditions of one or more Franchise Agreements with Pizza Hut, Inc., and to the restrictive provisions of the organizational documents of the issuer. Please refer to those documents for the terms of the restrictions.

The undersigned further certifies to PHI that the Articles of Organization and Operating Agreement of Franchisee restrict Franchisee's business activities to operations licensed by PHI or its subsidiaries and affiliates, and that Franchisee is in compliance with those restrictions.

This certificate is executed _____, 2002.

WITNESS:

_Linda Carini_

"Franchisee" ███████████

By: _____

its Manager and Sole Member

By: N█████████████████

G-1

## **APPENDIX H**

## **IT FUNCTIONAL SPECIFICATIONS**

1.   **POS Functional Specifications**

   a.   Complete precheck order processing for dine-in, carryout, delivery, window/counter and drive thru (as applicable).

   b.   Flexible pricing and promotion support.

   c.   Taxation by occasion, product class or bracketed tax.

   d.   Automated cash out with cash control reporting.

   e.   Tracking and reporting of Delivery Driver Reimbursements.

   f.   Delivery customer database.

   g.   Backup and recovery; automated.

   h.   Database of transaction level detail for all transactions (such warehousing of information should be discussed as to centralized approach).

   i.   Electronic I/O reporting features compatible with PHI. (Note: Any data collection should not impede Franchisee's ability to collect his own data).

2.   **Back of House Specifications**

   a.   Tracking and reporting of ideal usages.

   b.   Automated time keeping.

## APPENDIX I

## FACILITIES UPGRADE

Introduction.  The parties acknowledge that it is important to the System that Pizza Hut Restaurants be upgraded ("Upgrade") to present an attractive and current image to the public. For purposes of this Appendix I, references to "Pizza Hut Restaurants" in this Appendix I shall include all Pizza Hut Restaurants subject to the franchise agreements listed on Appendix I-1.

A.    Upgrades may be accomplished through one of four means:

1.    A relocation of an existing Pizza Hut Restaurant to a new location and building within the same trade area consistent with PHI's "R2K New Build Drawings and Specifications" (3/2000), "R2K2 New Build Drawings and Specifications" (3/2001) and "Main Path New Build Drawings and Specifications" (5/2000), or as Duly Modified (as hereinafter defined), or in accordance with plans submitted by Franchisee and approved by PHI (a "Relocation").  A Relocation would be intended to make the Pizza Hut Restaurant new, bigger (if warranted), more convenient and more accessible, or to adapt to a change in neighborhood necessitating a more desirable location.  A Relocation would involve a better site location, a bigger parking lot (if warranted), a new exterior and interior image, drive-through capability (as permitted), delivery capability and a high-volume kitchen.

2.    A complete rebuilding of an existing Pizza Hut Restaurant at the same location consistent with PHI's "R2K New Build Drawings and Specifications" (3/2000), "R2K2 New Build Drawings and Specifications" (3/2001) and "Main Path New Build Drawings and Specifications" (5/2000), or as Duly Modified, or in accordance with plans submitted by Franchisee and approved by PHI (a "Rebuild").  A Rebuild would be intended to make the Pizza Hut Restaurant new and bigger (if warranted).  A Rebuild would include a new building, new exterior and interior image, drive-through capability (as permitted), delivery capability and a high volume kitchen.

3.    A substantial renovation to an existing Pizza Hut Restaurant consistent with PHI's "Remodel Drawing Templates and Specifications (35 and 39 series)" (10/2001), or as Duly Modified , or in accordance with plans submitted by Franchisee and approved by PHI (a "Remodel").  A Remodel would be intended to make the Pizza Hut Restaurant look consistent with the then-current facility requirements.  A Remodel would consist of:  (i) with respect to the exterior, an image Upgrade, including the cupola, pediments, awnings, windows and a fresh parking lot, and (ii) with respect to the interior, dining room finishes and materials, furniture and booth lights, artwork and counters and buffet (which may be new or refurbished), new smallwares, and fresh and clean restrooms.

4.    A facelift for a Pizza Hut Restaurant in accordance with PHI's "Minimum Asset Standards and Reimage Specifications" (5/2002), or as Duly Modified, or in accordance with plans submitted by Franchisee and approved by PHI (a "Reimage").

Location Franchise Agreement

There shall be two types of Reimages—a Full Reimage and a Partial Reimage. A Full Reimage would be intended to make the Pizza Hut Restaurant appear up-to-date, and would consist of signage, paint, dining room finishes, dining room furniture and counters and buffet (which may be new or refurbished), new smallwares, a fresh parking lot and clean and fresh restrooms. A Partial Reimage would consist of maintenance of the exterior and interior of the Pizza Hut Restaurant and new signage.

For purposes of this Appendix I, changes to plans or specifications relating to the Relocation, Rebuilding, Remodeling or Reimaging of a Pizza Hut Restaurant are duly modified ("Duly Modified") if the additional costs of Relocating, Rebuilding, Remodeling or Reimaging a Pizza Hut Restaurant are not material (separately or in the aggregate) and such changes have been made after prior consultation with the Upgrade Committee. Any changes to plans or specifications shall not be applicable to any Pizza Hut Restaurant which previously has been, or which currently is being, Relocated, Rebuilt, Remodeled or Reimaged, as of the date such change is announced. Any Upgrade which does not conform to the standards for a Relocation, Rebuild, Remodel, or Reimage, or as Duly Modified (a "non-standard Upgrade") shall nonetheless qualify as the applicable Upgrade if Franchisee submits the plans for the non-standard Upgrade to PHI and receives PHI's prior written approval, which shall not be unreasonably delayed or withheld.

B.  1.  The obligations of a Franchisee to Relocate, Rebuild, Remodel or Reimage a Pizza Hut Restaurant shall depend upon (i) the weekly per restaurant average sales ("WPRA") of such Pizza Hut Restaurant during 2002, and (ii) the number of persons within a three (3) mile radius of the Pizza Hut Restaurant, as determined on the basis of statistical information provided by American Clearing House (ACH) or such other information provider as PHI and IPHFHA may jointly designate:

a.  If the WPRA for a Pizza Hut Restaurant is $14,000.00 or more (a "High Volume Restaurant"), Franchisee shall either Remodel, Relocate or Rebuild such Pizza Hut Restaurant.

b.  If the WPRA for a Pizza Hut Restaurant is less than $14,000.00 but greater than $9,500.00 and there are 15,000 or more persons within a three (3) mile radius of the Pizza Hut Restaurant (a "Middle Volume/High Population Restaurant"), Franchisee shall either Remodel, Relocate or Rebuild such Pizza Hut Restaurant.

c.  If the WPRA for a Pizza Hut Restaurant is less than $14,000.00 but greater than $9,500.00 and there are less than 15,000 persons within a three (3) mile radius of the Pizza Hut Restaurant (a "Middle Volume/Low Population Restaurant"), Franchisee shall, at a minimum, Fully Reimage the Pizza Hut Restaurant. Franchisee may also, at its option, Relocate, Rebuild or Remodel that Pizza Hut Restaurant in order to comply with its obligations as set forth in this Appendix I.

d.  If the WPRA for a Pizza Hut Restaurant is $9,500.00 or less and there are 15,000 or more persons within a three (3) mile radius of the Pizza Hut Restaurant (a

"Low Volume/High Population Restaurant"), Franchisee shall, at a minimum, Partially Reimage the Pizza Hut Restaurant; provided however, that Franchisee must either Remodel, Relocate or Rebuilt 50% of Franchisee's Low Volume/High Population Restaurants. Franchisee may also, at its option, Rebuild, Relocate, Remodel or Fully Reimage one or more of its other Low Volume/High Population Restaurants in order to comply with its obligations as set forth in this Appendix I.

e.    If the WPRA for a Pizza Hut Restaurant is $9,500.00 or less and there are less than 15,000 persons within a three (3) mile radius of the Pizza Hut Restaurant (a "Low Volume/Low Population Restaurant"), Franchisee shall, at a minimum, Partially Reimage the Pizza Hut Restaurant. Franchisee may also, at its option, Rebuild, Relocate, Remodel or Fully Reimage that Pizza Hut Restaurant in order to comply with its obligations as set forth in this Appendix I.

2.    Any Pizza Hut Restaurant that is Relocated, Rebuilt or Remodeled, regardless of whether it is a High Volume Restaurant, Middle Volume/High Population Restaurant, Middle Volume/Low Population Restaurant, Low Volume/High Population Restaurant or Low Volume/Low Population Restaurant, shall be counted as being Upgraded in determining whether Franchisee has met the development schedule set forth in Section D below.

3.    Regardless of whether or when a Pizza Hut Restaurant will be Relocated, Rebuilt, Remodeled or Reimaged, all Pizza Hut Restaurants must have the new Pizza Hut logo on pole signs not later than September 30, 2008. In addition, with respect to any Pizza Hut Restaurant that is scheduled to be Relocated, Rebuilt or Remodeled on or after January 1, 2009, Franchisee must, on or prior to September 30, 2008, remove its roof signage and, upon demand by PHI, paint the roof, as PHI may reasonably require.

4.    Franchisee shall only be required to Relocate, Rebuild or Remodel a number of Pizza Hut Restaurants (regardless of whether the Pizza Hut Restaurant is a High Volume Restaurant, Middle Volume/High Population Restaurant, Middle Volume/Low Population Restaurant, Low Volume/High Population Restaurant or Low Volume/Low Population Restaurant) which equals 87.5% of the sum of (A) the aggregate number of Franchisee's High Volume Restaurants and Middle Volume/High Population Restaurants as of January 1, 2003, and (B) 50% of Franchisee's Low Volume/High Population Restaurants as of January 1, 2003. For purposes of this Appendix I, in determining whether Franchisee is in compliance with the number of Pizza Hut Restaurants which must be Relocated, Rebuilt, Remodeled or Reimaged by a particular date, the results obtained by making any calculation shall be rounded down to the nearest whole number.

5.    All Relocations, Rebuilds and Remodels shall be completed in accordance with the development schedule set forth in Section D.1 below. High Volume Restaurants, Middle Volume/High Population Restaurants and Low Volume/High Population Restaurants which Franchisee elects not to Relocate, Rebuild or Remodel, as permitted under

I-3

Section B.4 above, shall be deemed "Excepted Restaurants" for purposes of Section D.2 below and shall be Reimaged in accordance with the development schedule set forth therein.

6. A Pizza Hut Restaurant which has been opened, Relocated, Rebuilt or Remodeled on or after January 1, 1998 is deemed to have been Upgraded; provided, that in the case of a Remodeled Pizza Hut Restaurant, the Remodeling complied with the standards under the New Construction Franchise Agreement in effect at the time of such Remodeling.

C. 1. Not later than ninety (90) days after the date of this Agreement, Franchisee shall submit to PHI a market plan which shall include a schedule (the "Initial Upgrade Schedule"), substantially in the form provided by PHI after consultation with IPHFHA, for all of the Pizza Hut Restaurants subject to this Appendix I. With respect to each Pizza Hut Restaurant subject to this Appendix I, the Initial Upgrade Schedule shall describe whether and when that Pizza Hut Restaurant will be Relocated, Rebuilt, Remodeled, Fully Reimaged or Partially Reimaged. PHI shall provide available resources (such as demographic information) that will assist Franchisee in completing its Initial Upgrade Schedule (or an Adjusted Upgrade Schedule).

2. a. PHI shall review the Initial Upgrade Schedule and not later than ninety (90) days after PHI's receipt of the Initial Upgrade Schedule, PHI shall notify Franchisee in writing whether or not it believes that (i) the Initial Upgrade Schedule has been prepared in accordance with the requirements set forth in Section B above, or (ii) Franchisee's Pizza Hut Restaurants have been scheduled for Upgrading in accordance with the development schedule described in Section D below ((clauses (i) and (ii) are hereinafter referred to as the "Upgrade Requirements"). Such notice (the "Initial Upgrade Schedule Notice") shall specify deficiencies, if any, in Franchisee's proposed Initial Upgrade Schedule. Except as otherwise provided in Section C.2.b below, within thirty (30) days of its receipt of the Initial Upgrade Schedule Notice, Franchisee shall make any required adjustments to its Initial Upgrade Schedule so that it meets the Upgrade Requirements.

b. If at any point the parties disagree on whether the Initial Upgrade Schedule meets the Upgrade Requirements, representatives of PHI and Franchisee shall meet and confer regarding the disagreement. If they are unable to reach agreement as to whether the Initial Upgrade Schedule meets the Upgrade Requirements, either party may submit the dispute to the Upgrade Committee, as described below.

3. a. Within six months prior to the third (3rd), sixth (6th) or eighth (8th) Anniversary Date (as hereinafter defined), if either PHI or Franchisee believes in good faith that market circumstances or asset performance of Pizza Hut Restaurants within Franchisee's Territory have changed materially subsequent to the date of this Agreement, then either party may request that the Initial Upgrade Schedule be revised (an "Adjusted Upgrade Schedule") so that the Pizza Hut Restaurants which have not yet been Relocated, Rebuilt, Remodeled or Reimaged can be appropriately reclassified to conform to the requirements of Section B above, with appropriate adjustments to be made to the applicable development schedules set forth in the Initial Upgrade Schedule to reflect the reclassification

I-4

App. 065

of these Pizza Hut Restaurants into the correct categories specified in Section B. In determining whether Franchisee is in compliance with its obligations to Upgrade as set forth in Schedule D.1, the Adjusted Upgrade Schedule shall become applicable at the next succeeding Checkpoint Date (e.g., if an Adjusted Upgrade Schedule is adopted in connection with the third Anniversary Date, Franchisee will not be required to meet the Adjusted Upgrade Schedule until the sixth Anniversary Date). For purposes of interpreting the conditions under which an Adjusted Upgrade Schedule is warranted, a change in "market circumstances" or "asset performance" shall not include lender financing or projected Upgrade sales performance, but may include then-current WPRA, then-current costs of construction and then-current real estate acquisition or rental costs, as they relate to the categories of Upgrade development outlined above.

      b.    If PHI and Franchisee are unable to reach agreement as to the terms of the Adjusted Upgrade Schedule, either party may submit the dispute to the Upgrade Committee, as described below.

      4.   a.   The Upgrade Committee shall review each party's proposed Initial Upgrade Schedule or Adjusted Upgrade Schedule, as applicable, and promptly make a non-binding written recommendation to PHI and Franchisee regarding what the Initial Upgrade Schedule or Adjusted Upgrade Schedule, as applicable, should be.

      b.   If PHI and Franchisee are not willing to accept the Upgrade Committee's recommendation and are not otherwise able to reach agreement as to the matters in dispute, then, within thirty (30) days after the Upgrade Committee's recommendation is issued, either PHI or Franchisee may file a demand for arbitration with the Center for Public Resources, Inc. ("CPR"), asking the arbitrator to determine what the Initial Upgrade Schedule or the Revised Upgrade Schedule, as applicable, should be. If neither party submits the matter to arbitration within thirty (30) days after the Upgrade Committee's recommendation is issued, the Initial Upgrade Schedule or Adjusted Upgrade Schedule, as recommended by the Upgrade Committee, shall be the Initial Upgrade Schedule or Adjusted Upgrade Schedule, as applicable, for purposes of this Appendix I.

      c.   If either party submits a demand for arbitration, then within twenty (20) days, each of PHI and Franchisee shall submit a position statement to the arbitrator, who shall have been selected as provided below, setting forth its proposed Initial Upgrade Schedule or Adjusted Upgrade Schedule, as applicable, and the basis for its position. The arbitrator shall rule that either PHI's proposal or Franchisee's proposal shall be the Initial Upgrade Schedule or Adjusted Upgrade Schedule, as applicable. The arbitrator may not issue any other ruling. The arbitrator shall issue his ruling within twenty (20) days after the date PHI and Franchisee were required to submit their position statements to the arbitrator. The arbitrator's decision shall be binding on PHI and Franchisee, unless the arbitrator has failed to follow the procedures set forth herein. For purposes of this Appendix I, the arbitrator's fees and expenses and the other administrative expenses of the arbitration shall be paid by the non-prevailing party.

d.    If CPR shall cease to exist or refuse to arbitrate such dispute, PHI and IPHFHA shall have the right to jointly appoint a substitute neutral organization to arbitrate disputes between PHI and its franchisees, and the rules of such substitute organization shall govern such arbitrations. Except as otherwise provided in this Appendix I, the arbitration shall be conducted in accordance with the CPR's (or its substitute's) rules of commercial arbitration. All arbitrations shall be conducted at a place designated by the arbitrator. Copies of all arbitration awards shall be immediately sent to IPHFHA by PHI.

e.    The Upgrade Committee shall be comprised of two Pizza Hut franchisees in good standing selected by IPHFHA and two representatives from PHI who are not from the Development Department or such other department within PHI responsible for restaurant development within the System.

5.    PHI and IPHFHA shall jointly appoint an arbitrator (the "Designated Arbitrator") to hear all disputes arising with respect to matters subject to this Appendix I. If a Designated Arbitrator dies, becomes disabled, or is otherwise unable or unwilling to serve in that capacity, PHI and IPHFHA shall jointly appoint a successor. Each of PHI and IPHFHA shall have the right to ask for the appointment of a successor to the Designated Arbitrator (a "Replacement Demand") after five decisions are issued by that Designated Arbitrator, but the replacement of a Designated Arbitrator shall not affect the arbitrator for any arbitrations filed before the Replacement Demand is received by PHI or IPHFHA, as the case may be. If PHI and IPHFHA have been unable at any time to agree upon the Designated Arbitrator, then an arbitrator for a dispute arising under this Appendix I shall be appointed by CPR (or its successor) in accordance with CPR's (or its successor's) rules of commercial arbitration.

D.    For purposes of this Appendix I, an Anniversary Date shall be December 31 of the applicable year, except that for purposes of Section D.2 below, the Anniversary Date for the Sixth Year shall be September 30, 2008.

I-6

1. Franchisee shall Relocate, Rebuild, or Remodel High Volume Restaurants, Middle Volume/High Population Restaurants, and 50% of Franchisee's Low Volume/High Population Restaurants in accordance with the following schedule:

| Anniversary Date | Percentage of High Volume Restaurants, Middle Volume/High Population Restaurants and 50% of Franchisee's Low Volume/High Population Restaurants To Have Been Upgraded By Such Anniversary Date* |
|---|---|
| First | 0 |
| Second | 5 |
| Third | 15 |
| Fourth | 25 |
| Fifth | 35 |
| Sixth | 45 |
| Seventh | 55 |
| Eighth | 70 |
| Ninth | 85 |
| Tenth | 100 |

* In determining whether Franchisee is in compliance with his development obligations pursuant to this Section D.1, the denominator of the fraction used to make such determination shall exclude (i) the number of Pizza Hut Restaurants that will be closed as set forth in the Initial Upgrade Schedule, and (ii) the number of Excepted Restaurants; and the numerator of such fraction shall include (i) all Pizza Hut Restaurants which have been Upgraded as provided in Section B.2 above, and (ii) any other Pizza Hut Restaurants which have been opened, Relocated, Rebuilt or Remodeled, as provided in Section B.6 above. If a Pizza Hut Restaurant is reclassified pursuant to Section C.3 above, then the denominator used in calculating this percentage shall be adjusted appropriately.

App. 068

2.      Franchisee shall Reimage Excepted Restaurants, Middle Volume/Low Population Restaurants and Low Volume/Low Population Restaurants in accordance with the following schedule:

| Anniversary Date | Percentage of Excepted Restaurants, Middle Volume/Low Population Restaurants and Low Volume/Low Population Restaurants To Have Been Fully Reimaged, Partially Reimaged, Relocated, Rebuilt or Remodeled, By Such Anniversary Date* |
|---|---|
| First | 20 |
| Second | 35 |
| Third | 50 |
| Fourth | 65 |
| Fifth | 80 |
| September 30, 2008 | 100 |

* In determining whether Franchisee is in compliance with his development obligations pursuant to this Section D.2, the denominator of the fraction used to make such determination shall exclude the number of Pizza Hut Restaurants that will be closed as set forth in the Initial Upgrade Schedule. If a Pizza Hut Restaurant is reclassified pursuant to Section C.3.a above, then the denominator used in calculating this percentage shall be adjusted appropriately.

E.      1.      For purposes of this Section E, a "Checkpoint Date" shall occur upon the third, sixth, eighth and tenth Anniversary Dates.

2.      If, on any Checkpoint Date, Franchisee has failed to Upgrade at least 90% of the Pizza Hut Restaurants that Franchisee was required to have Upgraded pursuant to Section D.1., such failure shall constitute a "Reversionary Event." Upon notice of such a Reversionary Event from PHI, the provisions of this Agreement will be deemed amended as follows:

a.      Section 1.29 will be deemed deleted in its entirety and replaced with the following:

"Term. "Term" means the period during which the rights granted by this Agreement are in effect, which starts on January 1, 2003 and (unless terminated earlier as allowed by Section 18) ends on the day before the 20th anniversary of this Agreement, with no right of renewal; provided, however, that Franchisee will have a right to renew this Agreement as to Pizza Hut

I-8

App. 069

Restaurants that Franchisee Rebuilds, Relocates or Remodels as described in Appendix I. The terms of such renewal will be as provided in Section 2.8."

[The Section 2.8 referred to above shall be to such provision as amended below.]

        b.     Sections 2.8 will be deemed deleted in its entirety and replaced with the following:

    "A.    <u>Renewal</u>.    Franchisee has no right to renew this Agreement as to any Pizza Hut Restaurant, Delivery Restaurant, or Delco Restaurant except that, with respect to any Pizza Hut Restaurant that Franchisee Rebuilds, Relocates or Remodels in accordance with PHI's standards on or after January 1, 1998, Franchisee will have a right to renew this Agreement as to such Pizza Hut Restaurant, provided that Franchisee satisfies each of the following criteria:

        1.     Franchisee has given PHI written notice of Franchisee's intent to renew no less than 2 and no more than 9 months before expiration of the initial Term.

        2.     Franchisee has executed a general release, in a form prescribed by PHI, of all claims Franchisee has against PHI, its Affiliates, and the shareholders, officers, directors, and employees of each of them.

        3.     Franchisee and its Affiliates are not in default under this Agreement or under any other agreement with PHI on the date Franchisee gives its notice of intent to renew or on the last day of the Term, and Franchisee has not been given notice of default under this Agreement (even if cured) more than three times during the last two years of the Term.

        4.     Franchisee is in compliance with PHI's operating standards, as set forth in the current version of the Manual (including achieving a passing score on Franchisee's most-recent inspection).

        5.     Franchisee has completed an "approved investment" in the System Restaurant at the Location no more than 6 months before expiration of the Term. An "approved investment" is construction of a new unit (at the Location or at a substitute site approved in accordance with Section 2.4) of the current prototype restaurant structure being utilized by PHI, or another significant capital investment in the System Restaurant (such as a major remodeling and renovation, extensive structural changes, or substantial modification of existing improvements) that has been approved by PHI as a condition to renewal. Upon written request from Franchisee no more than 24 months before the end of the Term, PHI will inspect the System Restaurant at the Location, and inform the Franchisee of the options for approved investment that will satisfy this criterion for renewal.

I-9

If Franchisee fails to satisfy the criteria for renewal set forth above, then at PHI's option, PHI may decline to renew the franchise for the Location, may grant a new franchise on substantially different terms (including shorter duration and higher fees) even if not then generally being offered to new franchisees, or may impose other conditions.

B.  **Form of Renewal Agreement.**  If Franchisee satisfies each of the criteria for renewal set forth in Section 2.8.A, above, then Franchisee will be entitled to renew on a form of franchise agreement substantially similar to this Agreement, but with changes believed necessary or advisable by PHI in light of changes in the law or similar developments.  In no event, however, may the new franchise agreement: (a) require any initial or renewal fee; (b) impose continuing royalties at a rate higher than 4% (unless such Pizza Hut Restaurant was Remodeled on or after July 1, 2006, in which case the continuing royalties rate shall not be higher than 5%); or (c) have a duration less than 15 years."

c.  Section 2.9 will be deemed deleted in its entirety.

d.  Section 6.3 will be deemed deleted in its entirety and replaced with the following:

"PHI will not impose any new or modified standard that requires structural changes, remodeling or renovation with a cost estimated by PHI to exceed $10,000 per System Restaurant, more often than once every 5 years. Notwithstanding the forgoing, PHI may require that all of Franchisee's System Restaurant be maintained consistent with PHI's image and, by no later than September 30, 2008, include only the new "Pizza Hut" logo and signage."

e.  Section 9.2. B will be deleted in its entirety and replaced with the following:

"Notwithstanding Section 9.2. A., the Monthly Service Fee rate applicable to gross sales at Pizza Hut Restaurants that Franchisee has Rebuilt, Relocated or Remodeled in accordance with PHI's specifications regarding such asset actions since January 1, 1998, will be reduced to 4% from the date such asset is opened (after Rebuild, Relocation or Remodel is completed) through the balance of the Term (unless such Pizza Hut Restaurant was Remodeled on or after July 1, 2006, in which case the continuing royalties rate will be reduced to 5% from the date such asset is opened after Remodel is completed through the balance of the Term)."

f.  This Appendix I will be deemed deleted in its entirety, except for the definitions of "Rebuild", "Relocate" or "Remodel".

App. 071

The remedy specified in this Section E.2 shall be PHI's sole and exclusive remedy with respect to Franchisee's breach of, or default under, the provisions of this Appendix I.

F. PHI and IPHFHA may mutually agree upon such rules as they jointly deem appropriate to implement the provisions of this Appendix I to the extent that such rules are not inconsistent with the terms hereof.

G. Only disputes and controversies arising out of the requirements of this Appendix I shall be submitted to arbitration as described above.

H. Except as set forth herein, PHI will not impose any new or modified standard that requires structural changes, remodeling, or renovation with a cost estimated by PHI to exceed $10,000.00 per System Restaurant more often than once every 5 years (a "Refurbish"). PHI may not require any such work at a particular System Restaurant less than 7 years after the System Restaurant opened, less than 7 years after the Restaurant was Relocated, Rebuilt or Remodeled, or less than 5 years after it was last Reimaged or Refurbished, and in no event may PHI require such work prior to January 1, 2013 or at a rate in excess of fifteen percent (15%) per annum of Franchisee's Pizza Hut Restaurants which have been Rebuilt, Relocated or Remodeled. Upon receipt of written notice, Franchisee shall fully implement such changes to each of its System Restaurants subject to this Appendix I, but in no event will Franchisee be required during any calendar year to implement such changes at a faster percentage rate than made to PHI-owned System Restaurants in the United States for the prior calendar year.

I. In making any calculations pursuant to this Appendix I, all percentages shall be expressed in terms of decimals (e.g., "75%" shall be ".75").

## APPENDIX I-1

## LIST OF FRANCHISE AGREEMENTS WHOSE RESTAURANTS ARE SUBJECT TO THE PROVISIONS OF APPENDIX I

**Franchise Agreement 1219** — ███████████
**Franchise Agreement 1225** — ███████████
**Franchise Agreement 1220** — ███████████

I-1-1

# **APPENDIX J**

## **SIDE LETTERS**

Location Franchise Agreement

# APPENDIX K

## BYLAWS
## OF
## PIZZA HUT NATIONAL PURCHASING COOP, INC.

### Article II

### Stockholder Members

2.6    Purchase Commitment. Each stockholder member shall purchase virtually all Goods and Equipment for use in the stockholder member's retail outlets through the purchasing programs of the Unified Coop and the Coop. "Virtually all" with respect to Goods and Equipment means all Goods and Equipment except Goods and Equipment:

(a)    Where the Unified Coop or the Coop agrees in advance in writing that the stockholder member need not purchase the particular item or category of Goods or Equipment through the purchasing programs of the Unified Coop;

(b)    Where the stockholder member determines in good faith, after written notice to the Unified Coop (or if prior notice is impractical, with notice given as soon as possible), with respect to a specific item or category of Goods or Equipment for specific retail outlets that (i) the Unified Coop is unable to meet the member's required volume of supply of the particular Goods or Equipment, or (ii) the Unified Coop is unable to meet previously established quality standards with respect to particular Goods or Equipment;

(c)    Where the stockholder member determines in good faith, after written notice to the Unified Coop (or if prior notice is impractical, with notice given as soon as possible), that the Unified Coop's purchasing policies or procedures with respect to the particular item or category of Goods or Equipment present a material business risk to the member, which the member is unwilling to assume, because of the Unified Coop's volume, hedging or similar commitments, arrangements or policies; or

(d)    Purchased after the termination of the stockholder member's membership in the Coop.

K-1

App. 075

## APPENDIX L

### PIZZA HUT RESTAURANTS
### PREVIOUSLY SUBJECT TO
### NEW CONSTRUCTION FRANCHISE AGREEMENT

| Pizza Hut Restaurant | Date Opened | Expiration Date of Old Franchise Agreement |
|---|---|---|
| 477 W. Sunset Dr. Waukesha, Wisconsin | 7/19/02 | 7/18/22 |

Location Franchise Agreement

L-1

## AMENDMENT TO PIZZA HUT, INC.

## LOCATION FRANCHISE AGREEMENT

## FOR THE STATE OF WISCONSIN

In recognition of the requirement of the Wisconsin Fair Dealership Law, the parties to the attached PIZZA HUT, INC. LOCATION FRANCHISE AGREEMENT (the "Agreement") agree as follows:

Section 20.1 of the Agreement, "Jurisdiction and Governing Law", shall be supplemented by the following sentence which shall be considered an integral part of the Agreement:

The Wisconsin Fair Dealership Law supersedes any provisions of the applicant's franchise contract or agreement inconsistent with that law.

To the extent this Amendment shall be deemed to be inconsistent with any terms or conditions of said Franchise Agreement or Exhibits or Attachments thereto, the terms of this Amendment shall govern.

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Amendment to the Franchise Agreement on the same day and year that the Franchise Agreement has been executed.

WITNESS:

PIZZA HUT, INC.

By: _____ , Vice President

WITNESS:

By: _____ Its

Manager and Sole Member
By: _____ President